900 A.2d 1043 (2006)
The PHILADELPHIA HOUSING AUTHORITY, Appellant
v.
AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, DISTRICT COUNCIL 33, LOCAL 934.
Commonwealth Court of Pennsylvania.
Argued November 16, 2005.
Decided June 20, 2006.
*1044 Mary Theresa Metzler, Philadelphia, for appellant.
Samuel L. Spear, Philadelphia, for appellee.
*1045 BEFORE: COLINS, President Judge, and SMITH-RIBNER, Judge, PELLEGRINI, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.
OPINION BY Judge LEADBETTER.
The Philadelphia Housing Authority (Authority) appeals from the order of the Court of Common Pleas of Philadelphia County (common pleas), which denied the Authority's petition to vacate the arbitration award reinstating Thomas Mitchell after the Authority had terminated him for sexual harassment of a co-employee. We are once again faced with the issue of whether the arbitration award draws its essence from the applicable Collective Bargaining Agreement (CBA). After review, we reverse.
On October 23, 2002, Mitchell, a member of the American Federation of State, County, and Municipal Employees, District Council 33, Local 934 (the Union), was fired from his job at the Authority's central warehouse facility following an investigation into a complaint of sexual harassment by Stephanie Broadnax, a co-worker. In response, the Union filed a grievance on Mitchell's behalf, alleging that the Authority violated Article VIII of the parties' CBA, which provided, in pertinent part, "[n]o disciplinary action or discharge shall be imposed upon any employee without just cause . . . ." Reproduced Record (R.R.) at 61a. Notably, the CBA did not define the term "just cause." The Authority had a policy prohibiting discrimination and harassment on the basis of sex. See EEO and Sexual Harassment Policy, R.R. at 95a. Moreover, the Authority had posted a notice in the workplace, which stated that sexual harassment was illegal, that such harassment included, among other things, unwelcome sexual advances, suggestive or lewd remarks, and unwanted touching, and that a finding that such harassment had occurred could result in a variety of disciplinary measures, including termination. See R.R. at 97a.
After the CBA's grievance procedure failed to resolve the dispute, the parties tendered the matter for arbitration.[1] The parties submitted the following question to the arbitrator: "[W]hether the Authority had just cause to terminate [Mitchell's] employment, and, if not, what [is] the appropriate remedy[?]" Arbitrator's op. at 27; R.R. at 40a. In resolving this issue, the arbitrator found that Mitchell committed the alleged misconduct. Specifically, based upon the evidence presented, the arbitrator found that Mitchell repeatedly sexually harassed a female co-worker by hugging her, rubbing his penis against her buttocks while she was attempting to file paperwork, and explicitly articulating his desire to engage in sexual acts with her. Despite these findings, the arbitrator determined that two circumstances mitigated against termination: (1) management at the central warehouse facility was aware of and condoned horseplay of a sexual nature; and (2) Mitchell stopped his sexually harassing misconduct after he received a verbal warning from one of the Authority's lower-level supervisors.[2] Weighing these *1046 mitigating circumstances against Mitchell's misconduct, the arbitrator concluded that the Authority lacked "just cause" to terminate Mitchell. Accordingly, the arbitrator awarded a "make whole" remedy, which included an order providing for Mitchell's reinstatement. Shortly thereafter, the Authority filed a petition to vacate the arbitrator's award with the trial court, which was denied. The present appeal followed.
Prior to addressing the Authority's arguments on appeal, it is necessary to set forth the narrow confines of an appellate court's review of an arbitration award. As this court recently noted in Southeastern Pennsylvania Transportation Authority v. Transport Workers Union of America, 880 A.2d 731 (Pa.Cmwlth.2005):
[O]ur Supreme Court has emphasized that arbitration of labor disputes is final and binding and is mandated by the Legislature, thereby requiring a court reviewing an arbitrator's award to accede "great deference" to it. The arbitrator's award is, therefore, final and binding unless the award does not draw it essence from the collective bargaining agreement. This exception is called the "essence test". . . .
Id. at 734 (citations omitted). The essence test requires a two-part inquiry. First, the court shall determine whether the issue, as defined, comes within the terms of the CBA and, second, if it does, whether the award is rationally derived from the CBA. Id. See also State Sys. of Higher Educ. (Cheyney Univ.) v. State Coll. Univ. Prof'l Ass'n (PSEA-NEA), 560 Pa. 135, 743 A.2d 405 (1999). In addition, it is now well established that the "usual degree of deference to be accorded an arbitrator's award is moderated in a situation in which the arbitrator's interpretation of the agreement led to the governmental employer relinquishing essential control over the public enterprise, i.e., those powers essential to its ability to discharge its functions." Greene County v. Dist. 2, United Mine Workers of Am., 578 Pa. 347, 361, 852 A.2d 299, 308 (2004). Both the Pennsylvania Supreme Court and this court have held that a government employer cannot bargain away its power to fire for misconduct bearing directly upon the performance of its essential functions; this incapacity (referred to as contractual incapacity) imposes a legal restriction on an arbitrator's interpretation as to what the parties meant by "just cause." See, e.g., Office of Attorney Gen. v. Counsel 13, Am. Fed'n of State, County & Mun. Employees, AFL-CIO (OAG), 577 Pa. 257, 844 A.2d 1217 (2004); City of Pittsburgh v. Pittsburgh Joint Collective Bargaining Comm., 852 A.2d 452 (Pa.Cmwlth.2004).
Turning to the appeal presently before us, there is no dispute that the issue of whether Mitchell's misconduct constitutes just cause for discharge falls within the terms of the CBA. The disagreement arises over whether the arbitrator's interpretation of the CBA is rationally derived therefrom. On appeal, the Authority essentially contends that the arbitration award is not rationally derived from the CBA because it deprives the Authority of the ability to terminate an employee whose misconduct interferes with the Authority's ability to discharge one of its essential functions, that of meeting its legal obligation to protect its employees from sexual harassment and hostility on the job. In making this argument, the Authority notes that under both federal and state law, it has an affirmative duty to prevent sexually harassing *1047 conduct in the workplace. Stressing its legal obligation to maintain a safe work environment free of sexual harassment, the Authority contends that it lacks the contractual authority to avoid its legal obligation to investigate and prevent sexual harassment and maintain a safe workplace. Accordingly, the Authority maintains that the award causes it to lose essential control over its public enterprise and, therefore, the award is not rationally derived from the CBA.[3] The Union agrees that the Authority has a duty to protect its employees from sexual harassment, but denies that the cases cited above apply to this situation, or that the arbitrator's award unduly hampers the performance of the Authority's public function.
While the doctrine upon which the Authority relies, commonly called the "core function test," is well-established, the circumstances which will trigger its applicability have been described in only the most general terms, i.e., misconduct bearing directly upon the agency's performance of its essential functions. In deciding each case on its particular facts, we have explained the factors which led us to conclude that an essential function was or was not implicated, but we have yet to articulate the elements of a standard to guide this determination. Nevertheless, from review of the relevant cases, the outlines of such a test emerge.
Although decided under the now discredited "manifestly unreasonable" standard, three cases are generally considered to be the conceptual antecedents of the core function test, Philadelphia Housing Authority v. Union of Security Officers # 1 (Philadelphia Housing), 500 Pa. 213, 455 A.2d 625 (1983); County of Centre v. Musser (Musser), 519 Pa. 380, 548 A.2d 1194 (1988); and Pennsylvania Liquor Control Board v. Independent State Stores Union (ISSU), 520 Pa. 266, 553 A.2d 948 (1989) (ISSU). In Philadelphia Housing, our Supreme Court vacated the arbitration award reinstating a public housing security officer who had defrauded an elderly tenant. In doing so, the court observed that nothing in the CBA suggested that the Housing Authority had bargained away its power to discharge a dishonest employee, and further observed that, "such dishonest conduct constitutes an affront to the integrity of the entire Housing Authority security force." 500 Pa. at 215, 455 A.2d at 626. The court found that, "it is manifestly unreasonable to conclude that the Housing Authority could have intended to bargain away its absolute responsibility to ensure the integrity of its housing security *1048 force by discharging an officer who has defrauded one of the very people whom he is paid to protect." Id. at 216, 455 A.2d at 627.
In Musser, the Supreme Court affirmed the decision of common pleas, reversing an arbitration award and reinstating the discharge of two county prison guards who had repeatedly assaulted an inmate. Musser bears significant similarities to the present case. First, the assaults were outrageous and humiliating, but were not injurious. In addition, as the court noted, "the arbitrator accepted two of the Union's assertions: (1) that the conduct in question was merely `horseplay' between friends; and (2) that `horseplay' between guards and inmates had been long tolerated at the prison without ever before causing the discharge of a guard." 519 Pa. at 387, 548 A.2d at 1197. After concluding that the arbitrator properly found the offensive behavior to be more than minor, the court stated that, "[i]f the [Prison] Board is to carry out its duty relating to the safe-keeping of prisoners, the Board must have the unfettered power to discharge an employee who is found to have subjected an inmate to physical abuse." Id. at 396, 548 A.2d at 1201.
In ISSU, the Supreme Court reinstated the discharge of a liquor store manager who had falsified store records and misappropriated funds. In doing so, the court noted the absence of anything in the CBA "to suggest that the LCB had `bargained away' its power to discharge a proven thief; and it would be `manifestly unreasonable' to conclude that the agency intended to do so." 520 Pa. at 277, 553 A.2d at 953-54. The court further opined:
If an agency of the Commonwealth entered into an agreement, which expressly excluded conduct by an employee, of the nature herein, from the definition of "just cause" for discharging that employee, its validity would at best be questionable.
. . . .
[I]t should be recognized that a governmental agency does not have the freedom of a private enterprise to relinquish powers inherently essential to the proper discharge of its function.
Id. at 276, 277-78, 553 A.2d at 953, 954. As we observed in City of Pittsburgh v. Pittsburgh Joint Collective Bargaining Committee, while Philadelphia Housing, Musser and ISSU were all decided prior to the court's rejection in Cheyney University of the "manifestly unreasonable" standard of essence test review, the court continued to cite these cases for the proposition that a "public employer retains absolute authority to fire an employee for conduct that undermines the employer's discharge of its public function and duties." City of Pittsburgh, 852 A.2d at 456-57.
In City of Easton v. American Federation of State, County, and Municipal Employees, 562 Pa. 438, 756 A.2d 1107 (2000), our Supreme Court vacated an arbitration award that reinstated an employee who had been terminated by the City for holding a second job with another employer and submitting time sheets to both employers to collect double pay for hours actually worked for only one of the employers. The parties' CBA in that case provided that an employee could be immediately dismissed for willful misconduct or neglect of duty which resulted in significant adverse consequences to the City. Our Supreme Court noted that, in interpreting the term "willful misconduct" in the CBA, the arbitrator failed to take into account that the City, in entering into the CBA, "did not and could not relinquish those powers which were essential to its ability to properly discharge its various functions, including the power to terminate *1049 those employees who steal from the City itself, or steal from others while working for the City." Id. at 447, 756 A.2d at 1111. The court further noted that the fact that it was unclear which employer had been the victim of the theft did not command a different result, noting that it failed "to see how any government agency could ensure the proper discharge of its official functions if it lacked the power to discharge employees" who committed a theft against the government employer or a third party while they were working for the government agency. Id. at 449 n. 6, 756 A.2d at 1113 n. 6. Thus, since the arbitrator failed to take the foregoing into account when reinstating the dismissed employee, the court held that the award was not rationally derived from the CBA.
Four years later, in OAG, the Supreme Court reached a contrary conclusion. There, an individual employed by the Office of Attorney General as a Narcotics Agent II, was discharged after he was caught driving his state vehicle while off-duty and intoxicated. When the agent's Union grieved the termination, the arbitrator found that although the agent had committed the charged misconduct, because of mitigating circumstances, just cause was lacking for termination. Therefore, the arbitrator reinstated the agent without back-pay, conditioned upon his ability to refrain from further misconduct for three months following his return to work. After this court vacated the award, our Supreme Court reversed. It distinguished City of Easton, noting in pertinent part:
[W]e do not find that the award, reinstating an officer without back-pay for off-duty misconduct has required the governmental employer to bargain away control over core powers that are essential to the proper discharge of the functions for which the governmental entity is responsible.
577 Pa. at 273, 844 A.2d at 1227.
Shortly thereafter, in Greene County, our Supreme Court further elaborated on the importance of limiting an arbitrator's authority to interpret a "just cause" provision with respect to a public employer. In Greene County, there was no crime committed, but a Children and Youth Services caseworker violated written policy and state regulations by repeated failure to maintain records. The court concluded the caseworker's serious and chronic failure to document went to the core function of the public agency and jeopardized children the agency was charged to protect. In vacating the arbitrator's award in favor of the caseworker, the court explained:
The rationale expressed in our decision in City of Easton is rooted, in part, in the unique nature of the public employer in our Commonwealth. Unlike private sector employers, public employers are ultimately responsible for the health, safety, and welfare of our communities. Due to their unique nature and role, public employers must be able to perform the functions they are charged to carry out by our citizenry. Consistent with this status, our Court has recognized that public employers cannot be compelled in arbitration to relinquish powers that are essential to the proper discharge of their functions. Thus, while as a general proposition, an arbitrator has broad authority to interpret an undefined provision regarding termination for just cause in a collective bargaining agreement, to permit an arbitrator to interpret the agreement as to require reinstatement of an employee who was determined to have engaged in egregious misconduct that strikes at the very core function of the public enterprise would be to deprive the employer *1050 of its ability to discharge that essential function. An arbitrator's award granting reinstatement in such a situation would not be rational and would therefore fail the essence test.
578 Pa. at 362, 852 A.2d at 308 (citations omitted).
At about the same time Greene County was decided, this court decided City of Pittsburgh v. Pittsburgh Joint Collective Bargaining Committee, a case addressing the same issue. There, during working hours but while away from his workplace on an errand, a city employee stole DVDs from a local store. He was convicted of theft. The City terminated his employment, and the employee filed a grievance. The arbitrator determined the employee committed the theft, but he found two mitigating circumstances rendered termination unjust, and he awarded reinstatement. This court affirmed the reinstatement award, stating:
[The employee's] misconduct in the present case falls outside of the type of conduct ... as that bearing upon the governmental employer's discharge of its public functions. [The employee] did not commit a crime directly against his employer . . . or a third party while working. . . . Equally important, his theft did not impact a third party whom his employer, the City Department of Public Works, was charged with protecting, nor did it otherwise impair the city's ability to perform any part of its essential function. Therefore, the City was not precluded from bargaining with respect to whether that misconduct constituted just cause to terminate employment, and the arbitrator was at liberty to construe the `just cause' provision of the [collective bargaining agreement] in light of the many factors generally recognized as relevant indicia of contract intent.
852 A.2d at 458 (footnote omitted).
On the same day as City of Pittsburgh, this court decided another case raising the core public function limitation, Port Authority of Allegheny County v. Amalgamated Transit Union Local 85 (Port Authority), 853 A.2d 1090 (Pa.Cmwlth.2004), appeal denied, 584 Pa. 688, 881 A.2d 821 (2005). There, during work, an operator of public transportation groped one of his passengers. The operator pled guilty to harassment. Based on this and prior misconduct, the public employer fired the operator. A board of arbitrators found the operator committed serious misconduct, but based on mitigating factors, the board reinstated him. We determined the operator's misconduct fell squarely within the kind of conduct bearing upon the public employer's ability to perform its core function of providing safe public transportation. Thus, we vacated the award reinstating the operator because it was not rationally derived from the collective bargaining agreement.
Most recently, in Allegheny County Airport Authority v. Construction General Laborers & Material Handlers Union 1058 (Allegheny County), 874 A.2d 1250 (Pa.Cmwlth.2005), reargument denied June 20, 2005, this court addressed the test for applying the "core functions" limitation. There, an arbitrator determined an employee committed misconduct by refusing to tender his security badge, falsifying his time records, and getting "lost" for long periods of time during the workday. Nevertheless, the arbitrator examined mitigating factors and concluded the Airport Authority lacked just cause to discharge the employee. The arbitrator also reasoned, because the employee's job duties were not essential to the Airport Authority's core functions, the "core functions" *1051 limitation was inapplicable. We disagreed, reasoning:
The arbitrator misunderstood the extent of his authority to interpret the agreement. The core functions test requires not an analysis of the employee's job duties, but of the type of misconduct. It is core to the Authority's mission that the Airport be maintained as a secure facility. [The employee's] improper use of a security badge directly affected the Authority's ability to secure the airport for other employees as well as the general public. The Authority must be able to discharge employees who abuse their security badges, falsify time records, conceal their whereabouts at the facility and, in other ways, "breach the trust." If not, the Authority cannot carry out its core functions.
Id. at 1257.
As City of Easton and Allegheny County clearly demonstrate, the employer's unfettered right to discharge an employee for certain types of misconduct does not necessarily hinge on whether the employee's job responsibilities are critical to the performance of an important governmental responsibility, or whether the actual misconduct was criminal or caused harm to a party that the government entity sought to protect. Rather, the focus of the inquiry is whether the misconduct at issue interferes with the public employer's "control over its enterprise" or impedes the public employer's powers, which are essential to its ability to accomplish its functions. In other words, if the employee's misconduct interferes with the public employer's ability to ensure proper operation of its organization, then it cannot bargain away the ability to terminate an employee for such misconduct.
The application of these principles in the above described cases direct us to a multi-part test. First, where serious misconduct is of a sort which has a direct negative impact on the public function of the employing agency, such as preying upon or otherwise putting at risk those persons the agency is charged to serve,[4] there is no question that the core function test has been satisfied. On the other hand, where the conduct is of a type which will have only an indirect or potential impact on the agency's public duties, such as embezzlement or a breach of trust, two conditions must be met. The misconduct must be work-related[5]and must involve dishonesty[6] or other misconduct so egregious that if the agency is unable to curtail such behavior it risks relinquishing control of the orderly functioning of its operations. As in cases like ISSU, City of Easton or Allegheny County, it is not necessary that the particular act(s) of the discharged employee, standing alone, impairs or threatens the agency's operation, but rather that it is the type of conduct which, if left unchecked, may lead to such a result.
We believe that sexual harassment of the sort involved here, at least where it involves physical assaults, falls into this category. It is difficult to imagine how an agency can maintain orderly operations if its employees cannot be assured of a safe workplace in which their duties are not impeded by the fear, or actuality, of unrestrained *1052 sexual assaults. Moreover, as the Authority points out, to allow such behavior would place the agency itself in violation of both state and federal law. It is simply not rational to conclude that the Authority bargained for such a result; indeed, it lacks the power to bargain away its duty to protect its workforce from the type of conduct found by the arbitrator to have occurred here.
Accordingly, we reverse.
Judge SMITH-RIBNER dissents.

ORDER
AND NOW, this 20th day of June, 2006, the order of the Court of Common Pleas of Philadelphia County in the above captioned matter is hereby REVERSED.
DISSENTING OPINION BY Judge PELLEGRINI.
I join with Judge Simpson's dissenting opinion that conduct between co-workers is merely a workplace condition that does not fall within the core function exception to the essence test because a workplace condition is traditionally the subject of collective bargaining.
I write separately for two reasons. First, the majority has used this case as a vehicle to expand the "core functions" exception far beyond the limits that our Supreme Court meant it to apply. Second, due to the recent cases by our Supreme Court, I believe the area concerning what is the proper scope of review[1] in grievance arbitration is no longer settled, and the question of whether the essence test is the correct standard needs to be reexamined.

I.

The Core Function Public Policy Exception to the Essence Test
In applying the essence test, the scope and standard of review used for labor arbitrations is as follows:
[A] reviewing court will apply a two-prong analysis. First, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement. (Emphasis added.)
State System of Higher Education (Cheyney University) v. State College and University Professional Association (PSEANEA), 560 Pa. 135, 150, 743 A.2d 405, 413 (1999).
While the test is straightforward, our Supreme Court and this Court have been struggling for years with how to review arbitration cases under the essence test where the arbitrator's award condones conduct that was, in some way, against "public policy." The first attempt at a public policy exception was known as the *1053 "manifestly unreasonable" exception to the essence test. Under that version of the exception, if an arbitrator's award did not find just cause for discharge after finding that an employee engaged in conduct that was either criminal or akin to a breach of a fiduciary duty, such an award was considered irrational and manifestly unreasonable and could be set aside. This exception went to the second prong of the essence test in that a manifestly unreasonable decision could not be rationally derived from the collective bargaining agreement. See Pennsylvania Liquor Control Board v. Independent State Stores Union, 520 Pa. 266, 553 A.2d 948 (1989) (reversed an arbitrator's award that found grievant guilty of theft and other crimes against the employer, but considered other factors in mitigation in determining that there was no "just cause" for his discharge and substituted a lesser penalty); County of Centre v. Musser, 519 Pa. 380, 548 A.2d 1194 (1988) (reversed an arbitrator's award that found grievants to have engaged in charged abusive conduct to an inmate of the prison, including assaultive behavior, but arbitrator considered certain mitigating factors to find no "just cause" for dismissal and substituted a lesser penalty); Philadelphia Housing Authority v. Union of Security Officers, 500 Pa. 213, 455 A.2d 625 (1983) (reversed an arbitrator's award that found grievant had committed crime of fraud against one of employer's tenants, but found no "just cause" for dismissal and substituted a lesser penalty); Manheim Central Education Association v. Manheim Central School District, 132 Pa. Cmwlth. 94, 572 A.2d 31 (1990) (reversed an award where an arbitrator found charged immoral conduct of grievant to have occurred, but found no "just cause" for dismissal and substituted a lesser penalty).
The "manifestly unreasonable" test was repudiated in Cheyney which held that a standard based upon reasonableness ("reasonable interpretation" and "manifestly unreasonable") was inappropriate to uphold the policy goals of binding arbitration. Our Supreme Court stated that "[a] mere reasonableness standard encourages a reviewing court to assert its own brand of labor relations philosophy. It emboldens a court to become a `superarbitrator' and to vacate an award when it finds that the award is at odds with how the members of the court would have decided the case." Cheyney, 560 Pa. at 149, 743 A.2d at 413.
Just after the manifestly unreasonable standard was abolished in Cheyney, in City of Easton v. American Federation of State, County and Municipal Employees, AFL-CIO, Local 447, 562 Pa. 438, 756 A.2d 1107 (2000), a new public policy exception was adopted, later named in Greene County v. District 2, United Mine Workers of America, 578 Pa. 347, 852 A.2d 299 (2004), as the "core function" exception. In Easton, a city employee was discharged for allegedly requesting and receiving pay for hours not worked, falsifying records and neglecting duties. He filed a grievance, and a board of arbitrators ruled that the city did not have just cause to terminate the employee. In reversing the arbitrators' award, our Supreme Court stated that, "governmental entities do not have the freedom to relinquish their right to terminate an employee who is proven to have stolen property from them." Easton, 562 Pa. at 447, 756 A.2d at 1112.
Unlike Easton, Greene County did not involve a criminal act but conduct that was tantamount to dereliction of duty. In that case, an arbitrator reinstated a caseworker employed by Children and Youth Services where the undisputed evidence showed that despite repeated counseling, warnings and suspensions over many months, the employee's performance was *1054 so deficient that it placed children under his supervision in mortal danger. Eventually overturning the arbitrator's decision, our Supreme Court held that while an arbitrator generally has broad authority to interpret an undefined provision of a collective bargaining agreement (CBA) regarding termination for just cause, governmental authorities do not have the same freedom as private enterprises to discontinue or bargain away control over functions the government has a public responsibility to provide. To permit an arbitrator to interpret a CBA so as to require the reinstatement of an employee who was determined to have engaged in such egregious misconduct that it strikes at the "very core function of public enterprise" would be to deprive an employer of its ability to discharge that essential function. Because in those instances an arbitrator's award granting reinstatement would not be rational, it would fail the essence test. Under that exception, because a public employer does not have the power to relinquish those powers which are essential to its ability to discharge its various governmental functions, the "usual degree of deference to be accorded an arbitrator's award is moderated in a situation in which the arbitrator's interpretation of the agreement led to the governmental employer relinquishing essential control over the public enterprise, i.e., those powers essential to its ability to discharge its functions." Greene County, 578 Pa. at 361, 852 A.2d at 308.
Utilizing the above-quoted language, the majority here expands the core function exception to such an extent that it supplants the essence test itself. It first refashions whether the conduct goes to a "core function" to one that goes to "control over the enterprise" stating:
[T]he employer's unfettered right to discharge an employee for certain types of misconduct does not necessarily hinge on whether the employee's job responsibilities are critical to the performance of an important governmental responsibility, or whether the actual misconduct was criminal or caused harm to a party that the government entity sought to protect. Rather, the focus of the inquiry is whether the misconduct at issue interferes with the public employer's "control over its enterprise" or impedes the public employer's powers, which are essential to its ability to accomplish its functions. In other words, if the employee's misconduct interferes with the public employer's ability to ensure proper operation of its organization, then it cannot bargain away the ability to terminate an employee for such misconduct.
By recasting the exception in this way, what the majority has done is change the exception from one that examines whether the arbitrator has condoned conduct that affects a "core function," the ability of the agency to function, to one that examines whether the conduct affects the employer's ability to have "control over the enterprise."
By changing the focus from whether the award impedes the "function" to whether it impedes "control," the majority makes discipline a core management right that takes away from the arbitrator any discretion not to impose the discipline desired by employer, once the employee is found to have committed the charged misconduct. This is at variance with the generally accepted notion that a collective bargaining, by its very nature, limits the employer's control over managerial functions, especially in determining what is "just cause" for discharge. Pennsylvania Labor Relations Board v. State College Area School District, 461 Pa. 494, 337 A.2d 262 (1975). If the parties agreed that an employee could only be discharged for "just cause," the arbitrator had jurisdiction over the *1055 dispute, notwithstanding that there was an existing statutory exclusive remedy. Pittsburgh Joint Collective Bargaining Committee v. City of Pittsburgh, 481 Pa. 66, 391 A.2d 1318 (1978). Under this portion of the majority's analysis of the exception, if an employee refused a direct order to sweep the floor in a certain way, an arbitrator would not have jurisdiction to find no just cause for discharge because it would affect management's right to "control the enterprise."
The majority then goes on to adopt a multi-part test to determine whether the type of misconduct involves the "core of the enterprise." Under that test, an arbitrator's award can be reversed if it fails to impose discipline for conduct that has:
1. Direct Negative Impact. "Misconduct is of a sort which has a direct negative impact on the public function of the employing agency, such as preying upon or otherwise putting at risk those persons the agency is charged to serve, the core function test has been satisfied;" or
2. Indirect or Potential Impact. "If the conduct is of a type which will have only an indirect or potential impact on the agency's public duties, such as embezzlement or a breach of trust, two conditions must be met. The misconduct must be work-related and must involve dishonest or other misconduct so egregious that if the agency is unable to curtail such behavior it risks relinquishing control of the orderly functioning of its operations."
(Op. at pp. 1051-52.)
Like it refashioned the exception from one concerned about the "function" to one concerned with "control," the majority expands the conduct that affects control to almost any conduct that could potentially harm the enterprise. It states that it is "not necessary that the particular act(s) of the discharged employee, standing alone, impairs or threatens the agency's operation, but rather that it is the type of conduct which, if left unchecked, may lead to such a result." (Op. at 1052.)
Under the majority's formulation of what conduct is covered by the exception, a court could reverse an arbitration award that reinstated an employee who was terminated for being late one time because, while that conduct standing alone may not constitute just cause for discharge, it may impair or threaten the agency's operation. Simply stated, if one employee's lateness remains unchecked, it may lead to another employee being late and then another, and then everyone will be late making it difficult for the public employer to insure the proper operation of the agency. While this may be an extreme example, what this illustrates is that the majority would refashion what is "just cause" for termination or discipline based not on the seriousness of the employee misconduct, but instead on what might occur if the employee is not disciplined, which is contrary to all notions of "just cause" in American labor law.
As I interpret the Supreme Court's holdings in Greene County and Easton (upon which Greene County is based), for an award to fall within the exception, the award must condone an employee's conduct that impedes the governmental entity's ability to carry out its "core functions" as the result of a course of intentional series of acts directly related to their employment either involving malfeasance in carrying our the duties that the agency was created to perform (Greene County) or stealing from the agency because the agency cannot carry out "core functions" without money (Easton). In other words, the misconduct at issue for the core function test has to go to the very core of the agency's functions or its ability to function, *1056 not some speculative concern that if the conduct is left unchecked, it will impede the agency's ability to carry out its core responsibilities. Because I agree with Judge Simpson that conduct between co-workers is merely a workplace condition that does not affect the agency's ability to function in any significant way, I would hold that the arbitrator's award does not involve conduct that comes within the core function exception to the essence test and affirm.

II.

The Essence Test is not a Workable Test for Public Sector Labor
This unwarranted expansion of the "core function" exception, though not in the form taken here, was predicted by Justice Saylor's reluctant concurrence in Greene County where he predicted that the "core function" doctrine was unworkable because, like here, the exception would subsume the essence test. He stated in full:
As suggested by the dissent in City of Easton v. American Fed'n of State, County and Mun. Employees, AFL-CIO, Local 447, 562 Pa. 438, 756 A.2d 1107 (2000), [with Chief Justice Cappy] the core functions doctrine fashioned in that case is inherently incompatible with an exclusive focus on rational derivation from the collective bargaining agreement, as reflected in the essence test as developed by this Court. See id. at 451, 756 A.2d at 1114 (Cappy, J., dissenting). See generally State Sys. of Higher Educ. (Cheyney Univ.) v. State College Univ. Prof'l Ass'n (PSEA-NEA), 560 Pa. 135, 150, 743 A.2d 405, 413 (1999) (articulating the essence test). For this reason, although I certainly respect the majority's effort, I believe that it is ultimately unsuccessful in its attempt to couch the result of this case in terms of a reasoned application of the essence test. In my view, City of Easton supplants the essence test in favor of something akin to the otherwise discredited manifest unreasonableness standard, for certain cases arising in the public sector in which the employer's core functions can be said to be implicated by the arbitrator's decision. As I am bound by City of Easton, I concur in the result.
Greene County, 578 Pa. at 364-365, 852 A.2d at 310.
Unlike Justice Saylor's lament that "core function" would eventually devolve to the "manifestly unreasonable" test and supplant the "essence test" in examining an arbitrator's decision that condoned illegal or despicable conduct, I would embrace a modified manifestly unreasonable test and have it supplant the essence test with all of its jerry-rigged exceptions in a slightly different form to review all labor arbitrations, including ones that do not involve discipline. I make this suggestion because I believe the "essence test" taken from federal labor law involving the enforcement of private sector collective bargaining in federal courts is simply inapplicable in public sector labor relations. More importantly, it is not the standard given to us by the General Assembly to review public sector labor arbitrations. Because I am suggesting overthrowing the existing regime of reviewing public sector arbitration awards, I need to explain from the beginning how that scope of review came to be.

A.

Contract Arbitration

1. Private Contract Arbitration
Labor arbitration is just another form of arbitration. Contractually provided for arbitration between private parties, which is the private resolution of disputes "bargained *1057 for" in a contract, was initially not favored by the courts because it deprived parties, especially those with no bargaining power, the right of access to the courts, as well as ousting the courts' jurisdiction over disputes that normally would come before them. It also precluded the courts from determining whether agreements to arbitrate future controversies should be specifically enforceable. Courts made it difficult for private parties to arbitrate, including requiring the parties in the agreement to name in the contract the arbitrator before whom disputes would be arbitrated and, if this was not done, the jurisdiction of the courts was not ousted. Commercial Union Assurance Company v. Hocking, 115 Pa. 407, 8 A. 589 (1887).
Dissatisfied with the hostility of the courts to arbitration, the General Assembly enacted legislation that authorized parties to contractually provide for arbitration of disputes arising out of the interpretation of a contract. "Whatever may have been the previous attitude of courts toward such agreements, since the Act of April 25, 1927, P.L. 381, 5 P.S. § 161, [Arbitration Act of 1927] the courts of this state have had no hesitancy in enforcing contracts containing arbitration clauses, even where the arbitrators were not named in advance." Bashford v. West Miami Land Company, 295 Pa. 560, 568, 145 A. 678, 681 (1928). The enactment of the Arbitration Act of 1927 caused the courts to shift their attitude from one of hostility to one where "[i]t is unquestioned that arbitration is a process favored today in this Commonwealth to resolve disputes. By now it has become well established that settlement of disputes by arbitration are no longer deemed contrary to public policy. In fact, our statutes encourage arbitration and with our dockets crowded and in some jurisdictions congested, arbitration is favored by the courts." Huegel v. Mifflin Construction Company, Inc., 796 A.2d 350, 358 (Pa.Super.2002).
As to what role the courts would play in reviewing private arbitration awards, judicial review has been allowed with the following scopes of review:
1. Common Law Arbitration. A common law arbitration award may not be vacated or modified unless it is clearly shown that a party was denied a hearing or that fraud, misconduct, corruption or other irregularity caused the rendition of an unjust, inequitable or unconscionable award. 42 Pa.C.S. § 7341. Pennsylvania Social Services Union, Local 668, SEIU v. Com., Dept. of Labor & Industry, Bureau of Workers' Compensation, 105 Pa.Cmwlth. 264, 524 A.2d 1005 (1987); Harleysville Mut. Ins. Co. v. Demarco, 328 Pa.Super. 513, 477 A.2d 563 (1984).
2. Uniform Arbitration Act. The Uniform Arbitration Act provides that an award may be vacated for procedural challenges to the jurisdiction of the arbitrator and/or fairness of the hearing. 42 Pa C.S. § 7314. Unlike common law arbitration, the UAA provides that a reviewing court is permitted to modify or correct an award in an arbitration proceeding conducted under its auspices only where "the award is contrary to law and is such that had it been a verdict of a jury, the court would have entered a different judgment or a judgment notwithstanding the verdict." 42 Pa.C.S. § 7302(d)(2).
3. Federal Standard. A standard that only allows courts to intervene for challenges to the jurisdiction of the arbitrator over or the fairness of the hearing. 9 U.S.C. § 10.

2. Public Sector Contract Arbitration
While the Arbitration Act of 1927 authorized private contractual arbitration, *1058 that change was irrelevant to the public sector because it was considered an unlawful delegation of governmental power for a governmental body to agree to arbitration. It was thought that such an agreement was prohibited by Article III, Section 31 of the Pennsylvania Constitution which provides:
[t]he General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatsoever.
This provision embodies a core principle of democracy that government policies should be made by elected officials and those answerable to them should make decisions, and not by private parties who are in no way answerable to the electorate.
The sea change for public sector arbitration occurred in Erie Firefighters Local 293 v. Gardner, 406 Pa. 395, 178 A.2d 691, 695 (1962), where our Supreme Court, interpreting that provision of the Pennsylvania Constitution (then numbered Article III, Section 20) held that arbitration was permissible in certain circumstances stating:
[T]he basic distinction between delegable and nondelegable functions (apart from the proscription against levying taxes) seems to be this: If the delegation of power is to make the law, which involves a discretion of what the law shall be, then the power is nondelegable. If the conferred authority is the power or discretion to execute the law already determined and circumscribed, then the delegation is unobjectionable. If we are correct in this interpretation of the rule, then there is no question but that the power to fix municipal salaries and to create a pension plan is nondelegable under our Constitution, for these matters, as have been mentioned above, are purely municipal functions.
After Erie Firefighters,[2] public bodies were allowed to engage in arbitration as long as any award did not infringe on the legislative power of the General Assembly or of the lawmaking body of a political subdivision of the Commonwealth by requiring the appropriation of funds and/or the levying of taxes; but if the award did so, then that award remained invalid as an unlawful delegation. Franklin County Prison Board v. Pennsylvania Labor Relations Board, 491 Pa. 50, 417 A.2d 1138 (1980); Division 85, Amalgamated Transit Union v. Port Authority of Allegheny County, 417 Pa. 299, 208 A.2d 271 (1965). While a public sector contractual arbitration was now permitted, it was not favored *1059 because it delegated to an arbitrator, a private party, rather than elected officials and those answerable to them.

B.

Labor Arbitration

1. Private Sector Labor Arbitration
In the private sector, however, collective bargaining agreements were considered just another type of contract between two parties and would be enforced like any other agreement. Section 301 of the Labor Management Relations Act of 1947, 32 U.S.C. § 185, provided that suits could be brought for specific performance of collective bargaining agreements. "As the [House and Senate] Conference Report stated: `Once the parties made a collective bargaining contract, the enforcement of that contract should be left to the usual processes of law' ..." Textile Workers of America v. Lincoln Mills of Alabama, 353 U.S. 448, 450, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Like negotiation of any other contract, the employer and the union by contract could agree to arbitration and, eventually, most collective bargaining agreements contained grievance arbitration provisions. When a party refused to follow an arbitration award interpreting contract language, the party seeking to enforce the award could bring an action for specific performance to enforce the award in federal courts. The question then became what defenses were available to thwart the enforcement of an arbitrator's award.
In United Steelworkers of America v. Enterprise Wheel and Car Corporation, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), one of the Steelworkers Trilogy cases, the United States Supreme Court established what has become known as the "essence test." In frequently-quoted language, it held that: "[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may, of course, look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." See United Steelworkers v. American Manufacturing Company, 363 U.S. 564, 80 S.Ct. 1363, 4 L.Ed.2d 1432 (1960); United Steelworkers v. Warrior and Gulf Navigation Company, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). See also Major League Baseball Players Association v. Garvey, 532 U.S. 504, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001).
Under this test, a court deciding whether a labor arbitration award should be enforced is limited to "determin[ing] only whether the arbitrator did his jobnot whether he did it well, correctly, or reasonably, but simply whether he did it." Mountaineer Gas Company v. Oil, Chemical & Atomic Workers International Union, 76 F.3d 606, 608 (4th Cir.1996). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision," United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) (emphasis added), the arbitrator is doing his job. The essence test, then, is not a test that delves into the merits of the dispute or examines the propriety of the outcome, but one that examines whether the arbitrator had jurisdiction to consider the mattera deference test.

2. Federal Public Policy Exception to the Essence Test
There is a federal exception to giving complete deference to the essence test, *1060 and it is very narrow both because it goes only to the remedy that the arbitrator awards and only in very narrow circumstances. Under this exception, courts will not enforce an arbitration award that is contrary to public policy and have stated, "the question of public policy is ultimately one for resolution by the courts." W.R. Grace and Co. v. Local Union 759, International Union of the United Rubber, Cork, Linoleum and Plastic Workers of America, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) (arbitration order that stopped voluntary compliance with the Civil Rights Act not against public policy). It is limited to situations where the arbitration award would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained `by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" Id. See also United Paperworkers (arbitration order that found no just cause to terminate where the employee was operating heavy machinery while drinking was not against public policy); Eastern Associated Coal Corporation v. United Mine Workers of America, District 17, 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000) (considerations of public policy, as reflected by Omnibus Transportation Employee Testing Act of 1991 and implementing regulations did not preclude enforcement of labor arbitration award ordering employer to reinstate truck driver who had twice tested positive for marijuana).[3]
Under the federal public policy exception, for a court to refuse to enforce an illegal act, the remedy that the arbitrator orders must require the employer or the union to take some other action that would violate the law or be against clear public policy. However, if the award simply does not punish an illegal act, it does not fall within the exception, and a federal court would enforce the award. This exception does not go to the correctness of the resolution of the underlying merits, where the federal courts still defer, but only to the legality of the remedy.

3. Pennsylvania's Public Sector Labor Arbitration
Because Erie Firefighters found that it was not unconstitutional for local government to arbitrate disputes, the General Assembly provided for grievance-arbitration to resolve disputes in the Public Employe Relations Act (PERA).[4] However, unlike the federal Labor Management Relations Act which made arbitration voluntary, Section 903 of PERA, 43 P.S. § 1101.903, provides: "Arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is mandatory. The procedure to be adopted is a proper subject of bargaining with the proviso that the final step shall provide for a binding decision by an arbitrator or a tri-partite board of arbitrators as the parties may agree. Any decisions of the arbitrator or arbitrators requiring legislation will only be effective if such legislation is enacted..." Thus, unlike the federal system where grievance arbitration is a negotiable term, grievance arbitration is statutory and mandatory for Pennsylvania public employers and unions.
*1061 There was, however, no scope of review of grievance arbitration awards set forth in PERA. Needing to adopt one, our Supreme Court adopted the federal essence test as the scope of review to be used in examining public sector arbitration awards, even though that test was not a scope of review but an affirmative defense pled in new matter in an action for specific performance to enforce in a private sector labor arbitration award in a federal court. The reason behind the adoption of this test was set forth by our Supreme Court in Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSNEA/NEA), 473 Pa. 576, 590, 375 A.2d 1267, 1273 (1977). It stated that like in private sector, there was a "need for stability in the public employer-employee bargaining relationship and are in agreement that the policy of Enterprise Wheel and Car, [363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)] while not binding upon us, is sound." Quoting from Enterprise Wheel and Car and adopting the federal essence test as follows:
The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards.
* * *
[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may, of course, look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.
Community College of Beaver County, 473 Pa. at 586, 375 A.2d at 1272. See also Cheyney, 743 A.2d at 411 ("In interpreting Pennsylvania's statutory standards for judicial review, our court expressly adopted and followed the Steelworkers Trilogy's standards favoring arbitration and of judicial deference to an arbitrator's award.")

4. Pennsylvania's Public Policy Exception to the Essence Test
As explained previously, Pennsylvania has had an on-and-off and on-again public policy exception to the essence test going from the "manifestly unreasonable" to the "core function" exception. No matter what version, the Pennsylvania public policy exception is much broader than the federal exception because it not only goes to whether the arbitrator did his job, but whether his determination on the underlying merits was done correctly. In effect, no matter what version of the essence test is utilized, it allows judicial intervention which the parties have not bargained for. As our Supreme Court stated in Cheyney, such an exception:
[E]mboldens a court to become a "superarbitrator" and to vacate an award when it finds that the award is at odds with how the members of the court would have decided the case. The admonition against such judicial intervention was persuasively stated by this court in Scranton Federation of Teachers v. Scranton School District, 498 Pa. 58, 444 A.2d 1144, 1147 (1982): "The parties to a collective bargaining agreement ha[ve] bargained for the arbitrator's construction, not the court's; thus, a court has no business intruding into the domain of the arbitrator because its interpretation of the agreement differs *1062 from his." The court's rejection of a broad review is well-founded. This approach takes away the dispute resolution procedure bargained for, and agreed to, by the parties, as well as undermines the many benefits of labor arbitration as a form of dispute resolution. Moreover, when a court vacates an arbitrator's award as being at odds with its idea of a proper resolution of the dispute, it inspirits employers and employees alike to seek judicial review when they do not prevail at arbitration, in the hope that they too can reargue their case, and win in court what they could not achieve in arbitration.
743 A.2d at 413. With that statement, our Supreme Court recognized that any exception to the essence test that examines the propriety of the arbitrator's decision strikes at the very nature of that test, a test that otherwise brooks no interference with the arbitrator's discretion as long as his or her interpretation comes from the essence of the agreement.
The question, then, is why we keep creating these exceptions when we know that they will subvert, diminish or hollow out the essence test. The answer is simple the essence test was created in the private sector and was never meant to apply to public sector bargaining where there are different factors that need to be taken into consideration and that are not encompassed within that test. As Chief Justice Nix stated in State College Area School Board, 461 Pa. at 499-500, 337 A.2d at 264-265, when urged to follow federal cases in interpreting PERA:
Although these decisions may provide some guidance, we are mindful of the distinctions that necessarily must exist between legislation primarily directed to the private sector and that for public employes. The distinction between the public and private sector cannot be minimized. Employers in the private sector are motivated by the profit to be returned from the enterprise whereas public employers are custodians of public funds and mandated to perform governmental functions as economically and effectively as possible. The employer in the private sector is constrained only by investors who are most concerned with the return for their investment whereas the public employer must adhere to the statutory enactments which control the operation of the enterprise. We emphasize that we are not suggesting that the experience gained in the private sector is of no value here, rather we are stressing that analogies have limited application and the experiences gained in the private employment sector will not necessarily provide an infallible basis for a monolithic model for public employment.
And, as more succinctly stated by Chief Justice Cappy in Greene County, "[u]nlike private sector employers, public employers are ultimately responsible for the health, safety, and welfare of our communities." Greene County, 578 Pa. at 362, 852 A.2d at 308.
Most importantly, when an arbitrator makes an outrageous decision in the private sector, it harms no one but the private employer or the private union. However, when an arbitrator makes an outrageous decision in the public sector, it leads to the third party beneficiary of the CBA being harmed, i.e., the public whose faith in the integrity in government needs to be maintained and who both the public employer and public employee have sworn to serve.
Not only does the private sector essence test fail to take into consideration the differences between the public and private sector enumerated by both Chief Justice Nix and Chief Justice Cappy, the federal essence test which is an affirmative defense *1063 to a suit to enforce a private sector arbitration award where arbitration is favored, contractual and voluntary, was never meant to be used as a scope of review for a public sector arbitration award where arbitration is constitutionally proscribed, statutory and mandatory. Using the essence test to review public sector labor arbitrations does not address the difference between private or public sector and it should be replaced with a more appropriate scope of review.

III.

Proper Scope of Review
If the "essence test" is not the proper scope of review, then what is? This is the easiest part of the analysis because the General Assembly has statutorily provided oneThe Uniform Arbitration Act of 1980(UAA). 42 Pa.C.S. §§ 7301-7362. The UAA explicitly sets forth the scope of judicial review of public sector agreements, including grievance-arbitration under collective bargaining agreements entered pursuant to PERA. 42 Pa.C.S. § 7302 provides how the UAA is to apply to all arbitrations that are entered into by a governmental agency. Quoted in full, it provides:
§ 7302. Scope of subchapter
(a) General rule.An agreement to arbitrate a controversy on a nonjudicial basis shall be conclusively presumed to be an agreement to arbitrate pursuant to Subchapter B (relating to common law arbitration) unless the agreement to arbitrate is in writing and expressly provides for arbitration pursuant to this subchapter or any other similar statute, in which case the arbitration shall be governed by this subchapter.
(b) Collective bargaining agreements.This subchapter shall apply to a collective bargaining agreement to arbitrate controversies between employers and employees or their respective representatives only where the arbitration pursuant to this subchapter is consistent with any statute regulating labor and management relations.
(c) Government contracts.This subchapter shall apply to any written contract to which a government unit of this Commonwealth is a party to the same extent as if the government unit were a private person, except that where a contract to which the Commonwealth government is a party provides for arbitration of controversies but does not provide for arbitration pursuant to any specified statutory provision, the arbitration shall be governed by this subchapter.
(d) Special application.
(1) Paragraph (2) shall be applicable where:
(i) The Commonwealth government submits a controversy to arbitration.
(ii) A political subdivision submits a controversy with an employee or a representative of employees to arbitration.
(iii) Any person has been required by law to submit or to agree to submit a controversy to arbitration pursuant to this subchapter.
(2) Where this paragraph is applicable a court in reviewing an arbitration award pursuant to this subchapter shall, notwithstanding any other provision of this subchapter, modify or correct the award where the award is contrary to law and is such that had it been a verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict.
As can be seen, 42 Pa.C.S. § 7302(c), in essence, provides that the statutory arbitration standard set forth in the UAA *1064 should apply to any written contract to which a governmental unit is a party. 42 Pa.C.S. § 7302(d)(1) provides that this standard of judicial review should apply where paragraph (2), 42 Pa.C.S. 7302(d)(2), applies where the Commonwealth submits a controversy to arbitration; a political subdivision submits a controversy with an employee or a representative of employees to arbitration; or any person has been required by law to submit or to agree to submit a controversy to arbitration pursuant to the statutory arbitration provisions. As to the scope of review, 42 Pa.C.S. 7302(d)(2) allows a reviewing court to modify or correct an award when "the award is contrary to law and is such that had it been a verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict."
Although the judgment n.o.v./error of law was mandated, our Supreme Court, in Community College of Beaver County, the case which adopted the federal essence test, also considered whether the judgment n.o.v./error of law test applied to public sector labor contracts under PERA.[5] Finding that the judgment n.o.v. standard applied, it stated:
Both parties assume, with some support in our case law, that the statutory standard [Arbitration Act of 1927, 5 P.S. 170, 17] is substantially different from the Enterprise Wheel and Car standard and provides for much closer scrutiny of arbitration awards than does the federal standard when vacation or enforcement of the award is sought in Pennsylvania courts. . . . As will be shown in part III, infra, however, we perceive no conflict between the standard of review contained in the Arbitration Act of 1927 and that recognized by federal decisional law in the field of labor relations. The two are not significantly different. (Footnote omitted.)
Community College of Beaver County, 473 Pa. at 586-587, 375 A.2d at 1272.
It then went on to compare those tests concluding that "the `n.o.v.' concept . . . is hardly a radical change, nor does it dictate that a much closer or different scrutiny of an arbitration award will be available than *1065 under the [essence test]." Id., 473 Pa. at 589, 375 A.2d at 1273. In other words, the essence test and the judgment n.o.v. scope of review are the same.
I respectfully suggest that the "essence test" is not the same as a judgment n.o.v. scope of review. Under the judgment n.o.v. standard, a court can review a judgment to determine whether, as a matter of law, the verdict is incorrect or the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. Moure v. Raeuchle, 529 Pa. 394, 604 A.2d 1003 (1992). While the essence test is a deference test only concerned with whether the arbitrator derives his decision not from the words of the agreement but from the gist of the words of the agreement, the judgment n.o.v. test is concerned with the outcomethe justness of the result.
A judgment n.o.v. scope of review would allow courts to set aside arbitration awards that come to a manifestly unreasonable outcome thereby protecting the public employer, the union and, most importantly, the public. Because this area is unsettled, I humbly urge the Supreme Court to reexamine what is the proper scope of review of public sector labor arbitrations.
In this case, though, we are still governed by the core function exception to the essence test. Because the arbitrator's award in putting the grievant back to work did not either go to a core function of the agency or, for that matter, impede employer's "control over the enterprise," I would affirm the order of the trial court upholding the arbitrator's award. Accordingly, I respectfully dissent.
Judge SIMPSON joins in this dissenting opinion.
DISSENTING OPINION BY Judge SIMPSON.
Although I acknowledge the thoughtful majority opinion greatly advances the analysis of the "core public function" limitation on a grievance arbitrator's interpretive authority, I respectfully dissent from the majority's expansion of this limitation.
Initially, I should state my agreement with several ideas. I agree a public agency's contact with those it is charged to serve is properly defined as a core public function. Also, I agree that trust, fidelity and competence are core concerns in the relationship between a public agency and an employee. Therefore, I harbor no doubts about the agency/public or the agency/employee aspects of the majority's analysis.
However, I disagree with the broad expansion of core concerns to relationships between co-employees. I believe conduct between co-employees which does not involve an objective risk of harm is a bargainable item within a grievance arbitrator's interpretive authority. In this regard, I note that workplace conditions are traditional subjects of bargaining. Under this approach, neither a claim of co-employee harassment nor a claim of hostile work environment would touch on a core public function. Also under this approach, it is not necessary to decide whether harassment is egregious or not, a standard which is sufficiently imprecise as to defy prediction and invite litigation.
In addition, I fear that the core public function exception as stated in the majority opinion is formed so expansively as to swallow the general rule of an arbitrator's broad discretion. The remedy is for a public employer to bargain for a definition *1066 of "just cause" for termination rather than for a court to impose a construction on the term.
In this case, the misconduct arose from co-employee conduct that did not involve an objective risk of harm. Accordingly, I conclude the misconduct does not imperil a core public function, and I would affirm the trial court's order, which affirmed the arbitrator.
Judge PELLEGRINI joins in this dissenting opinion.
NOTES
[1] Notably, when a dispute is submitted to arbitration, the CBA directs that, "[t]he decision of the arbitrator shall be final and binding upon the parties, hereto, but the arbitrator shall not have the power or authority to alter or modify the terms and conditions of this Agreement." Article VI of the CBA; R.R. at 60a.
[2] Mitchell was warned about his inappropriate conduct on June 29, 2002. Shortly thereafter, the Authority undertook a formal investigation into the sexual harassment charges lodged against Mitchell. During the investigation, the Authority allowed Mitchell to continue to work in the central warehouse facility. Following the completion of the investigation on October 23, 2002, the Authority fired Mitchell. The arbitrator determined that between the time Mitchell was warned and the date of his termination, Mitchell worked without any reported incidents of sexual misconduct.
[3] Specifically, the Authority argues that:

Since the [Authority] can be held liable for the sexually harassing conduct of an employee directed at a co-employee or for otherwise allowing a sexually hostile environment to exist, it has a duty to protect its employees from such misconduct and to maintain a working environment free of sexually harassing behavior. Thus, under the duty of care and protection aspect of the contractual incapacity principle, [the Authority] owed a duty of care and protection to Mitchell's co-workers and was required (in order to maintain "essential control") to address Mitchell's conduct and prevent it by terminating him....
. . . .
By reinstating Mitchell with back-pay, the arbitrator has effectively obstructed [the Authority's] ability to meet its legal responsibilities and perform the essential function of maintaining a workplace free of sexual harassment, and the conflicts, tensions, harm, hostility and poisonous environment which Mitchell's conduct created. Plainly, Mitchell's outrageous and unacceptable conduct (as found by the arbitrator) created a working environment [vis-à-vis] Ms. Broadnax that interfered with the efficient operation of the workplacea condition that obviously adversely affects the essential function of any employer.
Authority's appellate brief at 19-20.
[4] As inPhiladelphia Housing, Musser, Greene County and Port Authority.
[5] Compare OAG, City of Pittsburgh.
[6] Our Supreme Court characterized the falsification of time records in City of Easton as, "egregious misconduct that strikes at the very core function of the public enterprise." Greene County v. Dist. 2, United Mine Workers of Am., 578 Pa. 347, 362, 852 A.2d 299, 308 (2004). As such, work-related dishonesty may be said to amount to a per se example of conduct implicating a core function.
[1] Scope of review refers to "the confines within which an appellate court must conduct its examination." Morrison v. Department of Public Welfare, 538 Pa. 122, 646 A.2d 565, 570 (1994). In other words, it refers to the matters (or "what") the appellate court is permitted to examine. Id. Standard of review refers to "the manner in which (or "how") that examination is conducted ... [W]e also referred to the standard of review as the `degree of scrutiny' that is to be applied." Id. See Pa. R.A.P. 1551. The essence test is both the scope and standard of review.
[2] To allow for police and firefighters interest arbitration only, Article III, Section 31 was amended by adding the italicized language:

The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatsoever. Notwithstanding the foregoing limitation or any other provision of the Constitution, the General Assembly may enact laws which provide that the findings of panels or commissions, selected and acting in accordance with law for the adjustment or settlement of grievances or disputes or for collective bargaining between policemen and firemen and their public employers shall be binding upon all parties and shall constitute a mandate to the head of the political subdivision which is the employer, or to the appropriate officer of the Commonwealth if the Commonwealth is the employer, with respect to matters which can be remedied by administrative action, and to the lawmaking body of such political subdivision or of the Commonwealth, with respect to matters which require legislative action, to take the action necessary to carry out such findings.
[3] Citing federal cases, in City of Philadelphia Office of Housing and Community Development v. American Federation of State, County and Municipal Employees, Local Union No.1971, 583 Pa. 121, 876 A.2d 375 (2005), our Supreme Court held that under the essence test, an arbitrator cannot award punitive damages because government agencies have long been exempt from the imposition of punitive damages.
[4] Act of July 23, 1970, P.L. 563, as amended, 43 P.S. § 1101.101-1101.2301.
[5] Community College of Beaver was decided under the Arbitration Act of 1927 which had a judgment n.o.v. standard, error law standard as part of its general scope of review for all arbitrations. Under that Act, the scope of review of arbitration awards was set forth as follows:

In either of the following cases the court shall make an order modifying or correcting the award upon the application of any party to the arbitration:
(a) Where there was an evident material miscalculation of figures, or an evident material mistake in the description of any person, thing, or property referred to in the award.
(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matters submitted.
(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.
(d) Where the award is against the law, and is such that it had been the verdict of the jury the court would have entered different or other judgment notwithstanding the verdict. The court may modify and correct the award or resubmit the matter to the arbitrators. (Emphasis added.)
5 P.S. § 171 (repealed). In 1980, the Uniform Arbitration Act replaced the Arbitration Act of 1927. 42 Pa.C.S. § 7302, a section not contained in the modeled "Uniform Arbitration Act," was added to address the scope of review to be applied to public sector arbitration, including labor arbitration, and provided that the judgment n.o.v./error of law test was to be used. Nonetheless, in Pennsylvania State Education Association v. Appalachia Intermediate Unit 08, 505 Pa. 1, 476 A.2d 360 (1984), not mentioning the change, our Supreme Court held that the Uniform Arbitration Act was a reenactment of the Arbitration Act of 1927, nothing changed, and the essence test still applied.