**ALLEGHENY COUNTY AIRPORT AUTHORITY, Appellant**

v.

**CONSTRUCTION GENERAL LABORERS AND MATERIAL HANDLERS UNION, 1058.**

Commonwealth Court of Pennsylvania.

Argued Feb. 1, 2005.

Decided April 11, 2005.

As Amended May 5, 2005.

Reargument Denied June 20, 2005.

Gretchen K. Love, Pittsburgh, for appellant.

Domenic A. Bellisario, Pittsburgh, for appellee.

BEFORE: COLINS, President Judge, and SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Allegheny County Airport Authority (Authority) appeals from an order of the Court of Common Pleas of Allegheny County (trial court) that denied the Authority's petition to vacate an arbitration award. The arbitrator converted the Authority's discharge of Eric Allen (Allen) into a thirty-day suspension, concluding that Allen's insubordination and serious breach of trust warranted discipline but not a discharge. The question we consider here is whether the Authority had bargained away its right to discharge Allen for such conduct.

The underlying facts, as found by the arbitrator, are as follows. The Authority is a public entity established pursuant to the Municipality Authorities Act,[1] and it is responsible, *inter alia*, for operating the Pittsburgh International Airport (Airport). At the time of his discharge, Allen[2] had been employed by the Authority for approximately four years.[3] Because of restrictions related to a work-related disability, Allen was assigned to a light-duty position. His duties included inspecting and cycling jetways, inspecting and cycling trash compactors, light custodial work in maintenance shops and storerooms and other similar tasks. Allen recorded the time spent on each assignment, at each location, on daily work sheets.

The security system at the Airport requires that when an employee moves from one secure area to another, he must swipe his identification and security badge in an electronic reader to gain entry. Compactors and jetways are located in secure areas. Badge swipes are recorded at the security office, along with the time, location and identity of the badge holder, making it possible to track the movement of employees.

---

1. The Authority was created pursuant to the Municipality Authorities Act, 53 Pa.C.S. §§ 5601–5623.

2. Construction General Laborers and Material Handlers Union, Local 1058 (Union), the respondent in this matter, is an employee organization certified by the Pennsylvania Labor Relations Board in proceedings numbered PERA–R–00–218–W to be the exclusive collective bargaining representative for various employees of the Authority.

3. Allen has been employed by Allegheny County for approximately fourteen years total.

Prior to Allen's employment with the Authority, Allen worked for the Allegheny County Treasurer in the 1980's. Following a break in service, Allen was hired on October 10, 1989, in the Allegheny County Department of Special Services and Maintenance Operation. He remained there until 1995, when he was injured on the job and subsequently placed on workers' compensation. He was laid off in 1996. He was recalled to work in November 1997 and placed in a light-duty position at the Authority.

On July 31, 2002, Allen received a ten-day suspension when Allen's supervisors could not locate him, and their investigation showed that there was no clear record that he had reported to work that day. Thereafter, supervisors tracked Allen's movements over several days, from September 3 to September 13, 2002. By comparing Allen's badge swipe records with his written time records, his supervisors identified numerous instances where his badge swipes and time sheets did not match; specifically, the badge swipes showed that he did not stay long enough at a jetway or at a compactor to perform any useful work. There were periods of time during which Allen's activities could not be accounted for at all.

On March 4, 2003, Allen left work when he received a call from his son's school that his son was sick and needed to be taken home. When Allen was unable to find his supervisor to obtain permission to leave work, he notified a secretary in the maintenance office that he was leaving. The next day, Allen's supervisor questioned Allen about his leaving work early the day before. Allen lost his temper. His supervisor directed him to leave, but Allen refused to surrender his security badge until Airport Security intervened.

On March 12, 2003, Allen was discharged.[4] The Authority took this step because of the incident on March 5, 2003, and because Allen reported to work late, often left early, and used the phone excessively for personal business. The Authority further explained that these infractions together with his history of falsifying records and prior suspension required his discharge.[5]

Allen filed a grievance contesting his dismissal as violating the collective bargaining agreement. The grievance was ultimately submitted to arbitration, and a hearing was held on August 19, 2003.

4. Allen's Termination from Employment notice, dated March 12, 2003, read as follows:

> This is to advise you that you are being terminated.
> On March 4, 2003 you left work without following Authority procedures which require either permission or notice to a supervisor. On March 5 when questioned about your misconduct on March 4 you were insubordinate to the point that the Police had to be called to secure your swipe card and your badge and to escort you from the workplace. This conduct is intolerable from an Authority employee, especially in these times of heightened concern for the safety of the traveling public.
> Recently there have been complaints about your work performance, including that you have spent work time on unauthorized personal cellular telephone calls and that you have falsified your work records in the same way you falsified the records last year. You have a record of disciplinary warnings and suspensions over the last five years which includes a ten-day suspension in July of 2002 for misconduct which was the same as on March 4, namely, leaving the workplace without following Authority procedures.
> Therefore, you are hereby terminated from your employment with the Airport Authority effective immediately.
> R.R. 52a.

5. The arbitrator found that Allen had a history of disciplinary actions:

January 28, 1998: Insubordination. Persistent refusal to obey supervisor's order to clean up area around landside compactor.

August 16, 2000: Reprimand for making personal telephone calls after having been warned about making such calls except in emergencies.

August 22, 2000: Written reprimand for failing to swipe out at the end of the 7:00 A.M. to 3:00 P.M. shift. No record of time worked that day.

October 10, 2001: Insubordination. Warning for failing to follow instructions to get his supervisor's permission to use the terminal maintenance truck.

Arbitration Award of September 9, 2003, at 7 (Award at ——); Reproduced Record at 60a (R.R. ——).

The arbitrator found that, in fact, Allen had committed the acts that were cited by the Authority as the bases for his discharge. However, the arbitrator concluded that, for the most part, Allen was getting the job done in spite of his insubordination and use of the phone for personal calls;[6] the arbitrator believed, therefore, that this type of misconduct should be addressed by progressive discipline. More serious was Allen's failure to correct his behavior after his suspension in 2002 and his falsification of records, both of which the arbitrator termed as "a serious breach of trust." Award at 17; R.R. 70a. Even so, the arbitrator concluded that there were mitigating factors. First, the Authority did not suffer any real harm given the nature of Allen's job. As it was explained by the arbitrator:

> [Allen] is disabled and was working a make-work, light duty job cobbled together to give him something to do for eight hours a day. If he were not assigned to the tasks he was given, it is doubtful that any one employee would do them, if they were done at all.

Award at 17; R.R. 70a. Second, the arbitrator considered Allen's long term employment by the County and his disability to be mitigating factors.

Weighing the mitigating factors against Allen's acts of misconduct, the arbitrator concluded that the Authority lacked good cause to discharge Allen. Accordingly, the arbitrator converted Allen's discharge to a thirty-day suspension. In addition, the arbitrator placed Allen in last-chance status for a probationary period of one year of active employment.

On October 9, 2003, the Authority filed a Petition to Vacate, or in the Alternative, to Modify or Correct a Grievance Arbitration Award. The trial court denied the Authority's request and affirmed the arbitrator. The trial court reasoned that the parties placed before the arbitrator the meaning of "just cause," which was not defined; this authorized the arbitrator to interpret that term. The trial court also reasoned that Allen's conduct did not impair the Authority's ability to perform its core function of operating the Airport because Allen's job was not essential to the mission of the Airport. The Authority followed with this appeal.

 The Authority raises two issues on appeal. First, the Authority asserts that, under the "essence test," the arbitration award is not rationally derived from the collective bargaining agreement.[7] It

---

6. As for the incident on March 5, 2003, the arbitrator acknowledged that Allen's behavior was "over the line," but he concluded that Allen's notice to the office secretary "constructively fulfilled" his obligation with respect to leaving work. Award at 16; R.R. 69a.

7. The "essence test" is the appropriate standard to be employed by an appellate court when it reviews an arbitrator's decision in matters of this nature. In *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405 (1999), the Pennsylvania Supreme Court reaffirmed the deferential nature of the essence test. The essence test entails a two-prong

analysis. *Cheyney University*, 560 Pa. at 150, 743 A.2d at 413. First, it must be determined whether the issue submitted to arbitration, as properly defined, is encompassed within the terms of the collective bargaining agreement. *Id.* Second, the arbitrator's award must be rationally derived from the collective bargaining agreement. *Id.* A court will vacate an arbitrator's award only where the award indisputably and genuinely is without foundation in, or fails to flow logically from, the collective bargaining agreement. *Id.*

In *Pennsylvania Liquor Control Board v. Independent State Stores Union*, 520 Pa. 266, 553 A.2d 948 (1989), the Pennsylvania Supreme Court identified an important caveat to

asserts that the arbitrator implicitly found that the Authority, a public employer, had bargained away its right to discharge an employee for conduct that amounts to theft of services. Such a finding cannot be made in the case of a public employer. Second, the Authority argues that the arbitration award should be vacated because public policy requires that a public employer be allowed to discharge a public employee who has "breached the trust;" if not, the public employer will not be able to perform its core functions.

 We consider, first, the question of whether the Authority bargained away its right to discharge Allen for the type of misconduct that was found to have occurred. The collective bargaining agreement (Agreement) does not speak directly to this question. However, Article XV, section 1, authorizes the Authority to discharge an employee for just cause; it states that the Authority

> *retains and reserves exclusively matters of inherent managerial policy and all powers, rights,* authority, duties and responsibilities retained, conferred and/or *vested under law,* except as specifically abridged or modified by an express provision of this Agreement. The [Airport] *Authority's management rights include,* but are not limited to, *the rights: ... to discipline and discharge employees for just cause.*

Article XV, section 1; R.R. 37a (emphasis added). Disputes not resolved by grievance are referred to arbitration. The arbitrator's authority is defined as follows:

> The neutral arbitrator is authorized only to clarify and interpret the express terms, provisions, or clauses of this Agreement, and does not have the authority to enlarge, alter, modify, delete or change the express terms, provisions or clauses of this Agreement.

Article III, section 4(C); R.R. 22a. The trial court held that in modifying the Authority's discipline of Allen, the arbitrator was interpreting, not changing, the meaning of "just cause." Stated otherwise, the trial court held that the award drew its essence from the Agreement.[8]

In affirming the arbitrator, the trial court relied upon *Greene County v. District 2, United Mine Workers of America,* 578 Pa. 347, 852 A.2d 299 (2004). In *Greene County,* an arbitrator considered the discharge of a Children and Youth Services (CYS) caseworker who failed to complete his work in a timely fashion and in other ways was found to have performed his job in a negligent fashion. Because of mitigating circumstances, the arbitrator converted his discharge into a suspension. The employer challenged the award, asserting that

> once the arbitrator found that [grievant] engaged in the misconduct for which he was terminated, the arbitrator was required to find just cause and to uphold [grievant's] discharge and the arbitrator

---

the concept of judicial deference to the decisions of arbitrators:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; *he does not sit to dispense his own brand of industrial justice.* He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement.
> When the arbitrator's words manifest an infidelity to this obligation, courts have no

choice but to refuse enforcement of the award (emphasis added).
*Id.* at 273, 553 A.2d at 951 (citing *United States Steelworkers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)).

8. This is the second prong of the two-part essence test. *See supra,* note 8, for discussion of the two-part essence test.

was without the authority to alter the discipline imposed by the Employer. *Greene County,* 578 Pa. at 359, 852 A.2d at 307. However, following the reasoning in *Office of the Attorney General v. Council 13, American Federation of State, County and Municipal Employees, AFL–CIO,* 577 Pa. 257, 844 A.2d 1217 (2004), our Supreme Court noted that the job of the arbitrator is not just to act as factfinder but also to interpret the terms of the collective bargaining agreement. However, in interpreting a public employment collective bargaining agreement, the arbitrator's interpretative authority is limited where the employee's misconduct "jeopardizes the core function and mission of [the] public agency." *Greene County,* 578 Pa. at 361, 852 A.2d at 308. Because the Supreme Court concluded that accurate recordkeeping was essential to a discharge of CYS's core functions, CYS did not, and could not, relinquish its authority under a collective bargaining agreement to discharge the employee in question. Thus, the arbitrator's award, reducing the employee's discharge to a suspension, was vacated.

In this case, the trial court held that since Allen's job responsibilities were not very important, his false record-keeping did not require his discharge. Stated otherwise, the trial court understood the "core functions" test to apply not to a type of

misconduct but, rather, to the type of job duties of the particular employee subject to discipline.

The Authority offers another understanding of the core functions test, relying upon *City of Easton v. American Federation of State, County and Municipal Employees,* 562 Pa. 438, 756 A.2d 1107 (2000). In *City of Easton,* our Supreme Court held that the ability to discharge a laborer at the City's water department for theft of services was essential to the City's ability to perform its public function.[9] Because the City could not bargain away this right, the arbitrator's decision to transform a discharge into a suspension was set aside. Our Supreme Court emphasized the need for government to have the powers that are essential to the proper discharge of functions entrusted to that governmental body.[10]

■ In *Greene County,* which was decided shortly after *City of Easton,* our Supreme Court further explained why the authority of an arbitrator to interpret just cause is limited with respect to public employers. It stated as follows:

> The rationale expressed in our decision in *City of Easton* is rooted, in part, in the unique nature of the public employer in our Commonwealth.... *Unlike private sector employers, public employers*

---

**9.** In *City of Easton,* the employee was fired from his job at the City's water treatment facility for: requesting and receiving pay for hours not actually worked; falsifying records by recording data that implied that he had treated the drinking water supply with purification chemicals on occasions when he had not; and neglecting his duties by failing to treat the public water supply with the proper chemicals. *City of Easton,* 562 Pa. at 440, 756 A.2d at 1108. The arbitration board considered the falsification of time records "stealing", meaning that the employee was stealing time from the City. This case presents a similar set of factual circumstances.

**10.** In *Office of the Attorney General,* our Supreme Court distinguished *City of Easton* by finding that reinstating an officer without back pay for off-duty misconduct did not require the government entity to bargain away its control over core powers that are essential to the proper discharge of the functions for the government entity is responsible. *Office of the Attorney General,* 577 Pa. at 273, 844 A.2d at 1227. In that case, though, the conduct was carried out off-duty. In the present case, Allen's behavior, termed "serious breach of trust" by the arbitrator, occurred while on duty at the Airport.

*are ultimately responsible for the health, safety, and welfare of our communities.* Due to their unique nature and role, public employers must be able to perform the functions they are charged to carry out by our citizenry. Consistent with this status, our Court has recognized that public employers cannot be compelled in arbitration to relinquish powers that are essential to the proper discharge of their functions. . . . Thus, while as a general proposition, an arbitrator has broad authority to interpret an undefined provision regarding termination for just cause in a collective bargaining agreement, *Office of the Attorney General,* to *permit an arbitrator to interpret the agreement as to require reinstatement of an employee who was determined to have engaged in egregious misconduct that strikes at the very core function of the public enterprise* would be to deprive the employer of its ability to discharge that essential function.

*Greene County,* 578 Pa. at 362, 852 A.2d at 308 (citations omitted) (emphasis added). In short, a public employer cannot bargain away the ability to discharge an employee whose conduct strikes at the "core function of the public enterprise."

This is not to say that an arbitrator may never modify a discharge to a suspension or other discipline of a public employee. *City of Pittsburgh v. Pittsburgh Joint Collective Bargaining Committee,* 852 A.2d 452 (Pa.Cmwlth.2004) is instructive. In that case, a City employee, Carl Huntley, asked his co-workers to drop him off in downtown Pittsburgh to run a personal errand while on his way to a work assignment. Huntley did not return to work that day or the following day. The personal errand consisted of stealing three

DVDs from a store, for which he was arrested and charged with theft. Upon his return to work, Huntley lied. When the City learned of the theft, it first imposed a five-day suspension and then eventually discharged Huntley.

The arbitrator considered mitigating circumstances such as the length of employment and the fact that shoplifting did not affect the City because the misconduct was irrelevant to his job for and at the City. The arbitrator reinstated Huntley. In affirming the arbitrator, this Court stated,

> Huntley's misconduct in the present case falls outside of the type of conduct . . . as that bearing upon the governmental employer's discharge of its public function. *Huntley did not commit a crime directly against his employer.* . . . . When he left his co-workers, *Huntley removed himself entirely from the workplace and his work duties.* He was at that point off-duty . . . . Thus, he did not commit a crime against a third party while working . . . . Equally important, his theft did not impact a third party whom his employer, the City Department of Public Works, was charged with protecting, nor did it otherwise impair the city's ability to perform any part of its essential function.

*City of Pittsburgh,* 852 A.2d at 458 (emphasis added).

Here, by contrast, Allen's "theft" of services was directly related to his job with the Authority.[11] He committed a "serious breach of trust" directly against his employer by refusing to surrender his badge, falsifying his time records and making his whereabouts at the Airport unknown. Further, Allen's misconduct had the potential to impact third parties whom the Authority was charged with protecting,

---

**11.** We acknowledge that Allen was not charged with a crime. The Authority showed, nevertheless, that Allen's time sheets did not correspond to his badge swipes.

namely those individuals who rely on the Airport to remain secure while they are patronizing it.

The arbitrator found Allen's insubordinate conduct to be "over the line" and his falsifying of records to be a "serious breach of trust." However, the arbitrator also found that Allen "was working a make-work, light duty job cobbled together to give him something to do for eight hours a day," and if Allen "were not assigned to the tasks he was given, it is doubtful that any one employee would do them, if they were done at all," and finally, "the Authority suffered no serious loss because of [Allen's] dereliction." Award at 17; R.R. 70a. In short, the arbitrator did not believe Allen's misconduct struck at the core of the Authority's ability to operate a safe and security airport. This was error.

The arbitrator misunderstood the extent of his authority to interpret the Agreement. The core functions test requires not an analysis of the employee's job duties, but of the type of misconduct. It is core to the Authority's mission that the Airport be maintained as a secure facility. Allen's improper use of a security badge directly affected the Authority's ability to secure the Airport for other employees as well as the general public. The Authority must be able to discharge employees who abuse their security badges, falsify time

records, conceal their whereabouts at the facility and, in other ways, "breach the trust." If not, the Authority cannot carry out its core functions. The Authority did not bargain away its security responsibilities in the Agreement, and the arbitrator did not have the authority to so construe the "just cause" provision.[12]

For these reasons, we reverse the trial court.[13]

## ORDER

AND NOW, this 11th day of April, 2005, the order of the Court of Common Pleas of Allegheny County denying the Authority's Petition to Vacate, Modify or Correct the Grievance Arbitration Award, dated June 4, 2004, in the above-captioned matter is REVERSED. The arbitrator's award, dated September 9, 2003, is hereby VACATED.

**12.** In *Office of the Attorney General,* the Supreme Court explained as follows:

A just cause provision, in its most basic terms, is a negotiated form of limited job security that to a degree restricts the employer's otherwise unfettered right to *discharge* and discipline employees. Although there is no exact definition, there is a general consensus as to some of the factors that may be considered in determining whether there is just cause for discharge or discipline, and in evaluating the penalty imposed. Arbitrators have considered such factors as, *inter alia,* whether there was any

investigation; post-discharge misconduct and pre-discharge misconduct; a grievant's past employment record, length of service, post-discharge rehabilitation; and unequal treatment of other employees for similar misconduct.

*Office of the Attorney General,* 577 Pa. at 269, 844 A.2d at 1224–1225 (footnote omitted).

**13.** Because we reverse the trial court, we need not reach the Authority's second issue that the decision of the trial court is inconsistent with sound public policy.