**ALLEGHENY COUNTY AIRPORT AUTHORITY, Appellant**

v.

**CONSTRUCTION GENERAL LABORERS AND MATERIAL HANDLERS UNION 1058.**

Commonwealth Court of Pennsylvania.

Argued Oct. 10, 2007.

Decided Nov. 2, 2007.

---

Mary C. Barkman, Pittsburgh, for appellant.

Domenic A. Bellisario, Pittsburgh, for appellee.

BEFORE: FRIEDMAN, Judge, COHN JUBELIRER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

Allegheny County Airport Authority (Authority) appeals from an order of the Court of Common Pleas of Allegheny County (trial court) which denied Authority's petition to vacate or modify and correct the grievance arbitration award (Award). We affirm.

The Award set aside the discharge of Richard Glumac (Glumac), a laborer on the Authority's road crew from March 23, 2004 through his termination on March 15, 2005. On March 11, 2005, Glumac had entered a store at the Sunoco gas station on the Authority's property intending to purchase food and a beverage during his break. Glumac walked up to a female employee of the Sunoco store, Trish Burdick, and asked her to move so that he could get a doughnut. Burdick asked Glumac to wait until she finished filling the doughnut display. Glumac thereafter grabbed Burdick's ponytail and pulled her away from

the display. There was an exchange of words between Burdick and Glumac and then Burdick proceeded to wait on other customers.[1] Glumac paid for his items and left the store.

Burdick did not complain to either of her co-workers or anyone else while the incident was taking place. However,

[s]hortly, thereafter, Ms. Burdick saw a regular customer, Dave Schumacher, in the store. . . . Schumacher testified that Ms. Burdick seem[ed] upset, practically in tears, and he asked her what was the matter. Burdick told Schumacher what [Glumac] had done and said to her, and according to Schumacher told him that she would say something to a police officer whenever they came into the store. Ms. Burdick testified somewhat differently in that Schumacher noticed she was upset and he said to her that he would inform the police that she had been harassed. Schumacher testified that after he left the store and was headed to his office he encountered a County Police Officer who was on site and told them (sic) that Burdick wanted to talk to a Police Officer. Allegheny County Police Officer Diane Kuffner was dispatched to the Sunoco store at approximately 6:00 a.m. that morning. Burdick related to her that [Glumac] had pulled her ponytail and had also made prior inappropriate sexual innuendos to her.

Arbitrator's Opinion and Award, November 9, 2005 (Opinion), at 5. Officer Kuffner had Glumac brought to the police office at the airport for an interview.

Officer Kuffner thereafter charged Glumac with the summary offense of harassment.

Glumac was sent home early from work that day by his supervisor and was thereafter terminated on March 15, 2005, for inappropriate physical and verbal behavior towards another person in violation of the Authority's Policy # 701–Harassment. The Construction General Laborers and Material Handlers Union, Local 1058 (Union), filed a grievance challenging Glumac's discharge. Pursuant to the Union's and the Authority's collective bargaining agreement (CBA), the matter proceeded to arbitration.

On August 24, 2005, an arbitration hearing was held and on November 9, 2005, the arbitrator issued his award finding in pertinent part as follows:

Applying the Authority's policy to Grievant's interaction with Ms. Burdick I fail to see how his interaction with her was because of either her race, color, sex, religion, age, disability, ancestry, or national origin. Sex is arguably the only possible category that his behavior could fall under. However, every objectionable or annoying interaction between a male and a female is not necessarily *sexual* in nature. A male could quite easily be joking around and engaging in mild horseplay with a woman involving such actions as jabbing her in the arm . . . pulling her hair and other "silly" interactions. While the woman might very readily find these actions to be annoying, disturbing and upsetting they

---

1. The Arbitrator noted that Burdick testified that Glumac said "I bet you like it like that, you're probably used to that." Burdick stated that she responded "no" and that Glumac then said, "I find that hard to believe." Burdick acknowledged that she regularly joked with other Authority employees and on occasion would refer to them as "slack ass." Glu-

mac testified that when he approached Burdick he asked her to move and she replied "why don't you make me." He responded by tugging lightly on her ponytail and said "I bet you like that." Glumac stated that Burdick then laughed or smiled and moved out of the way. Arbitrator Opinion and Award, November 9, 2005, at 4.

would not constitute harassment under the Authority's policy, but could perhaps under the law.

\* \* \*

I must also take into consideration the fact that Ms. Burdick admitted to engaging in offensive banter with various Authority employees on prior occasions by referring to some of them as "slack ass" and "jack ass". The use of this type of language may have been taken by Grievant as an indication that it would be acceptable to also joke/kid around with Burdick. Moreover, even if it is found to be genuinely annoying by the recipient, it reasonably cannot be the cause for an individual to lose his job. This conclusion is especially reinforced when one considers there to be a complete lack of documented similar prior misconduct on the part of Grievant and, more importantly, a complete lack of prior warnings by the Employer about such behavior.

I recognize that Ms. Burdick raised for the first time (as part of this incident) some earlier alleged misconduct on the part of the Grievant, but unfortunately she never complained about the same.... Moreover, this other alleged misconduct is similarly tenuous as to whether it would constitute a violation of the Authority's harassment policy....

Even assuming arguendo that Grievant's conduct did, in fact, constitute a violation of the Authority's policy on harassment it clearly was not egregious in nature and at most would be considered a relatively minor and isolated infraction which certainly would not warrant termination for a first offense....

I would also note that the Authority's Policy is quite clear and specific in that it prohibits one employee harassing another **employee.** It does not expressly

prohibit an employee from harassing an individual who is not an employee.... In this situation Grievant's interaction was not with a co-worker but rather a third party who was neither a customer nor a vendor of the Authority. In fact, Ms. Burdick has no significant relationship to the Airport operations and any argument that the Authority has the responsibility of making it's premises "safe" for all visitors on its property is somewhat overreaching when applied to these circumstances....

[T]o his credit Grievant did *not* attempt to deny the basic elements of what occurred when confronted by the County Police and also offered to immediately apologize for his actions. Moreover, given the lack of any prior disciplinary episodes, nor any prior warnings for similar misbehavior, just cause clearly does not exist for Grievant's termination. A five day suspension is more than sufficient punishment for misconduct which does not specifically violate the Employer's harassment policy, as charged, but at the same time is clearly inappropriate behavior.

Opinion, at 12–17. Thus, the arbitrator reduced Glumac's discharge to a five-day suspension. The Authority petitioned the trial court to vacate the Award or, in the alternative, to modify or correct the Award. The Authority argued that the arbitrator exceeded his authority by modifying the disciplinary penalty imposed by the Authority once he found that the Authority had established "just cause" to support the discipline and that the Award does not draw its essence from the CBA, as it relied on a premise that was not contained in the CBA and which could not have been bargained away by the Authority. The trial court denied the Authority's petition to vacate, modify or correct the

Award. The Authority, thereafter, appealed to our court.

The Authority contends that the arbitrator's Award did not draw its "essence" from the CBA. Our standard of review is the "essence test," a standard calling for great deference to the arbitrator's interpretation of the CBA. The "essence test" is comprised of a two-prong analysis. "First, it must be determined whether the issue submitted to arbitration, as properly defined, is encompassed within the terms of the collective bargaining agreement ... [and] [s]econd, the arbitrator's award must be rationally derived from the collective bargaining agreement." *Allegheny County Airport Authority v. Construction General Laborers and Material Handlers Union, 1058*, 874 A.2d 1250, 1254 (Pa.Cmwlth.2005), citing, *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405 (1999).

Thus, we must first determine whether the issue submitted to arbitration, as properly defined, is encompassed within the terms of the CBA. The Union filed a grievance challenging Glumac's discharge. The issue before the arbitrator was "whether the Employer had just cause to terminate Grievant? If not, what should be the appropriate remedy?" Opinion, at 6. Article XVIII of the CBA authorizes the Authority to discharge or suspend an employee for "just cause." This Article also requires the Authority to notify the employee and the union in writing as to the reasons for the discharge or suspension. Article XVIII (2) of the CBA. The Authority's termination letter set forth that Glumac violated the Authority's harassment policy, Section 701 of the Authority's Administrative Policy Handbook (Handbook). Section 701 of the Handbook provides in pertinent part as follows:

Harassment of another employee because of that person's race, color, sex, religion, age, disability, ancestry or national origin violates state and federal laws which protect employees from employment discrimination. It also violates the policy of the ... Authority and is strictly prohibited.

What harassment is prohibited? Remarks, gestures, jokes or comments relating to age, ethnic or racial background, or religion are examples of harassing behavior, which may violate this policy. Sexual harassment, which is a form of illegal harassment, includes such things as requests for sexual favors, sexual advances, comments/e-mails which are sexually explicit, physical contact, vulgar remarks or jokes and any other works, pictures or actions of a sexual nature which are unwelcome and offensive behavior to those who are subject to them. Although isolated instances of offensive behavior may not violate the law, the Airport Authority's policy prohibits all harassing behavior. So if you choose to engage in this kind of conduct, you bear the risk that it will be unwelcome or offensive to others.

The arbitrator did find that Glumac's conduct was inappropriate, but he also determined that Burdick was not an employee of the Authority, and thus, Glumac could not have violated Section 701 of the Handbook, as that section only applies to "harassment of another employee." The arbitrator further found that Glumac's actions did not constitute sexual harassment as defined in the Handbook. The arbitrator determined that the Authority failed to show that Glumac violated Section 701 of the Authority's Handbook, which was the stated reason for his termination. Thus, the arbitrator concluded that the Authority did not have "just cause" to terminate

Glumac and reduced the Authority's discharge of Glumac to a five-day suspension. As the arbitrator was determining whether the Authority had "just cause" to terminate Glumac, the issue submitted to arbitration was within the terms of the CBA.

■ Secondly, we must determine whether the Award was rationally derived from the CBA. The Authority alleges that once the arbitrator found that Glumac had committed the alleged wrongdoing, the arbitrator stepped beyond the bounds of the CBA in reducing the discharge. The Authority states that it cannot bargain away the ability to discharge an employee whose conduct strikes at the "core function of the public enterprise." The Authority cites *Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees,* 900 A.2d 1043 (Pa. Cmwlth.2006), *petition for allowance of appeal filed,* (Pa. July 20, 2006), which further examined the "core function" concept. *Philadelphia Housing Authority* provides in pertinent part as follows:

> [T]he employer's unfettered right to discharge an employee for certain types of misconduct does not necessarily hinge on whether the employee's job responsibilities are critical to the performance of an important governmental responsibility, or whether the actual misconduct was criminal or caused harm to a party that the government entity sought to protect. Rather, the focus of the inquiry is whether the misconduct at issue interferes with the public employer's "control over its enterprise" or impedes the public employer's powers, which are essential to its ability to accomplish its functions. In other words, if the employee's misconduct interferes with the public employer's ability to ensure proper operation of its organization, then it

cannot bargain away the ability to terminate an employee for such conduct.

*Id.* at 1051. *Philadelphia Housing Authority* further set forth a multi-part test to determine if an employee's misconduct interferes with the public employer's ability to ensure proper operation of its organization. The test was set forth as follows:

> First, where serious misconduct is of a sort which has a *direct* negative impact on the public function of the employing agency, such as preying upon or otherwise putting at risk those persons the agency is charged to serve, there is no question that the core function test has been satisfied. On the other hand, where the conduct is of a type which will have only an *indirect* or *potential* impact on the agency's public duties, such as embezzlement or a breach of trust, two conditions must be met. The misconduct must be work-related *and* must involve dishonesty or other misconduct so egregious that if the agency is unable to curtail such behavior it risks relinquishing control of the orderly functioning of its operations. As in cases like *[Pennsylvania Liquor Control Board v. Independent State Stores Union ] ISSU,* [520 Pa. 266, 553 A.2d 948 (1989)], *City of Easton [v. American Federation of State, County, and Municipal Employees,* 562 Pa. 438, 756 A.2d 1107 (2000)] or *Allegheny County [Airport Authority v. Construction General Laborers & Material Handlers Union 1058,* 874 A.2d 1250 (Pa.Cmwlth.2005)], it is not necessary that the particular act(s) of the discharged employee, standing alone, impairs or threatens the agency's operation, but rather that it is the type of conduct which, if left unchecked, may lead to such a result.

*Philadelphia Housing Authority,* 900 A.2d at 1051.[2]

**2.** In *Philadelphia Housing Authority,* our        court determined that the public employee's

In the present controversy, Glumac's misconduct did not have a direct negative impact on the public function of the Authority. Glumac was a road crew worker for the Authority. Glumac's misconduct occurred while he was on a break from work and visiting the premises of a leased gas station on the airport's property, which is separate, apart from and outside of the airport terminal. The Authority's "core function" would include the protection of passengers on premises under its control, such as, the airport terminal, but does not directly encompass operating a gas station over which it has leased away its control and duty of protecting the well-being of that gas station's employees. Glumac's actions were directed toward a third party who was not covered by the Authority's harassment policy and who had no connection with the Authority or its operations other than to be working within the extensive boundaries of the airport property. As stated by Judge Pellegrini in his dissenting opinion in *Philadelphia Housing Authority*, not all conduct involves the "core functions" of an agency, we do not want to "expand the "core functions" exception far beyond the limits that our Supreme Court meant to apply." *Philadelphia Housing Authority*, 900 A.2d at 1052 (Pellegrini, J., dissenting). It is difficult to fathom how Glumac's misconduct interferes with the Authority's control over its enterprise when the Authority has relinquished control over the gas station by leasing it away and failed to express any control over its employees' relationships with non employees in non work related situations in its harassment policy in Section 701 of the Handbook upon which it relied in firing Glumac. Glumac's misconduct which was not work related or on premises controlled by the Authority did not interfere with the functioning of the Authority or the Authority's ability to protect those it serves.

Further, Glumac's conduct would not have an indirect or potential impact on the agency's public duties, as the two conditions required to prove such impact were not met. First, the misconduct must be work-related. As stated previously, Glumac was on a break from work at a gas station outside of the airport terminal which was not proven to be under the care, control, custody or supervision of the Authority and was with a person who was not an employee of the Authority. Thus, his misconduct could not be considered work-related.

Although we need not address the second condition, it was also not met. The second condition requires that the misconduct involve dishonesty or other misconduct so egregious that if the agency is unable to curtail such behavior it risks relinquishing control of the orderly functioning of its operations. Glumac's conduct did not involve dishonesty. In fact, he was found to be somewhat forthcoming with the officer who interviewed him. As for egregious, his conduct could hardly be called that. The arbitrator found his conduct "inappropriate" and "silly," but definitely not egregious. Thus, we agree with the trial court that Glumac's conduct did not interfere with the Authority's ability to ensure the proper operation of its organization.

sexual harassment, involving the repeated hugging of a co-worker, rubbing his penis against her buttocks when she was attempting to file paperwork, and explicitly articulating his desire to engage in sexual acts with her, was such that it affected the core function of the housing authority. This case is distinguishable from the case presently before us, as Glumac's conduct does not reach this level of causing employees to be "impeded by fear, or actuality, of unrestrained sexual assaults." *Id.* at 1051–1052.

Although Glumac's conduct was objectionable, we agree with the trial court that Glumac's behavior did not constitute the violation relied upon for termination within the context of the Authority's Policy # 701–Harassment nor does it inhibit the Authority's ability to perform its "core functions." The trial court was correct in determining that the arbitrator was interpreting, not changing the meaning of "just cause" in modifying the Authority's discipline of Glumac.

Accordingly, we affirm the decision of the trial court.

### ORDER

AND NOW, this 2nd day of November, 2007 the Order of the Court of Common Pleas of Allegheny County in the above-captioned matter is affirmed.