**PENNSYLVANIA TURNPIKE COMMISSION, Petitioner**

v.

**TEAMSTERS LOCAL UNION NO. 250, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 11, 2008.

Decided April 23, 2008.

Mark E. Ulven, Pittsburgh, for petitioner.

Ernest B. Orsatti, Pittsburgh, for respondent.

BEFORE: LEADBETTER, President Judge, and PELLEGRINI, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

The Pennsylvania Turnpike Commission (Commission) appeals from an award of an arbitrator, Edward J. O'Connell (Arbitrator), who sustained the grievance filed with the Commission by Teamsters Local Union No. 250 (Union) on behalf of Jean L. Glover (Grievant) and reinstated her to her former position with full back pay and benefits, less any interim earnings or governmental benefits received. We affirm the decision of the Arbitrator.

Grievant was hired by the Commission on October 21, 2002. After her training, she began work as a supplemental toll collector, filling in for permanent collectors on authorized leave. On July 25, 2003, Grievant became a full-time toll collector for the Commission at the Pennsylvania Turnpike's Warrendale Interchange. She held that position until her termination on May 15, 2006, for intentional falsification of official records.

As a toll collector, Grievant was responsible for collecting tolls by processing toll tickets through the Commission's computerized collection system. At the interchange in Warrendale, as well as most other toll plazas, the toll amount is based on the weight of the vehicle (class), the number of axles and the distance traveled on the Turnpike. When a vehicle enters the Turnpike, it passes over a metal plate that contains a scale for measuring the weight of each axle and a treadle to count the number of axles. The vehicle is classified by the sum of its axles' weights. A Class 1 vehicle is a two-axle vehicle that weighs 7,000 pounds or less. A Class 2 vehicle is a two-axle vehicle weighing 7,001 to 15,000 pounds. A Class 3 vehicle is a three-axle vehicle weighing 15,000 pounds or less. A passenger car is a Class 1 vehicle. The higher the class of vehicle, the higher the toll paid. The Commission uses a "light curtain" to detect the beginning and end of a vehicle in order to determine when the last axle has passed over the plate.[1] When the vehicle passes the plate, a ticket is issued which records the number of axles on the vehicle, the vehicle's class and the time, date and toll plaza where the vehicle entered.

When a vehicle exits the Turnpike, it crosses over another scale and treadle and passes through another light curtain. The toll collection monitor in the toll booth shows the toll collector the number of axles counted by the exit treadle. The axles are depicted on the monitor by an image that looks like a large capital "I". A two-axle vehicle will appear as "I I" on the toll collection monitor. The toll collector must process the vehicle transaction to remove the axles from the monitor and prepare the toll equipment to record and process the next vehicle. The collector takes the ticket from the customer and feeds it into

1. A light curtain is a group of light beams used to detect the beginning and end of a vehicle.

a ticket reader for processing. The information encoded on the ticket received at entry, as well as the exit information, including the toll collector number, exit interchange number and lane, exit date, time and transaction number are entered into the Commission's computer system. The toll amount is calculated for the collector and appears on the monitor. The collector receives the toll from the customer and, with the completion of the transaction, the axles are usually removed automatically from the monitor.

In almost all instances, the toll collector only needs to insert the ticket into the ticket reader and collect the toll from the customer. The information necessary to accurately calculate the toll is encoded on the ticket and verified by the toll lane pre-classification equipment. The collector normally has no legitimate reason to change the information entered into the computer but, on occasion, the information on the monitor may not match the entry information encoded on the ticket. The collector then must take some action to reconcile the conflicting information by correcting the information before collecting the toll. Such transactions are called "unusual occurrences" (UO) and are identified by specific codes.

For example, a van pulling a boat on a two-axle trailer should appear on the computer screen as "-I I I I+". Rarely, the classification equipment may not detect the hitch between a van and a trailer, in which case the collector would see "-I I–I I+". If that occurs, a beep will sound when the collector inserts the ticket into the ticket reader, prompting the collector to visually verify the correct number of axles on the vehicle. At that point, the vehicle is next to the collector's booth. If necessary, the collector should use the "REGROUP AXLE" button on the computer touch screen to reconfigure the axles

correctly to appear as "-I I I I+". If the tickets are not processed through the ticket reader, the axle images stay on the toll collector's monitor. Three Class 1, two-axle vehicles that have not been processed will appear on the screen as "-I I–I I–I I+". As each ticket is processed, a set of two axles will disappear from the screen. When the first of three unprocessed tickets is processed, the image on the screen will change from "-I I–I I–I I+" to "-I I–I I+", and so on.

The Commission's auditors have identified certain transactions that indicate collector manipulation of the toll system. This case involves three types of UO transactions.

The first type of UO transaction is UO5. This transaction showed up on Grievant's records when she used the "REGROUP AXLE" function to reconfigure two, two-axle vehicles into one, four-axle vehicle using a ticket from a nearby interchange, the Butler Valley interchange.

The second type of UO transaction is UO6. This transaction also showed up on Grievant's records when she used a Class 1, two-axle entry ticket from Butler Valley to process a vehicle that was recorded by the lane equipment as a Class 4 or higher (tractor trailer/commercial vehicle).

The third type of UO transaction is a UO7. This transaction showed up on Grievant's records when she obtained an unprocessed passenger car ticket from a nearby interchange, again the Butler Valley interchange. To obtain such additional ticket, a toll collector takes a ticket from a passenger car that entered the Turnpike at the Butler Valley interchange, collects the $1.00 fare but does not process the ticket. The two axles remain on the monitor. A short time later, a five-axle commercial vehicle from the Pittsburgh interchange enters the collector's lane. The vehicle owes a $7.00 fare. The monitor

shows the two unprocessed axles from the Butler Valley vehicle and the additional five axles from the Pittsburgh vehicle. The monitor now appears as: "-I I–I I I I I+". The collector then uses the "RE-GROUP AXLE" button to combine the two axles left from the Butler Valley vehicle with the five axles from the Pittsburgh vehicle into a seven-axle vehicle from Pittsburgh. The toll collection monitor now appears as: "-I I I I I I I+". The collector accepts the $7.00 fare from the Pittsburgh vehicle and inserts the Pittsburgh ticket into the ticket reader to process the fabricated seven-axle vehicle. The collector receives the correct $8.00 fare, $7.00 from the Pittsburgh vehicle and $1.00 from the Butler Valley vehicle, but the system recorded only a $7.00 fare for the seven-axle vehicle. More importantly, the collector now has the unprocessed $1.00 Butler Valley ticket to use to process a commercial vehicle from Philadelphia. The fare for a Philadelphia commercial vehicle exiting at the Warrendale interchange is $104.00, such that the toll collector could create an unrecorded surplus in a substantial amount from the next transaction from Philadelphia.

The Commission determined that Grievant had an extraordinarily high number of all three types of UO transactions, especially when compared to other toll collectors at the Warrendale interchange. The most significant discrepancy was UO6 transactions, as when Grievant used a Class 1, two-axle ticket to process a vehicle in Class 4 or higher. Between January 1, 2006 and April 1, 2006, Grievant had forty-two UO6 transactions. The collector with the next highest number had three, and four other collectors had only one each. Of the thirty-four collectors tracked, twenty-eight did not have any UO6 occurrences during this period. In the same period, Grievant had twenty-one UO5 transactions, in which she regrouped axles on a

vehicle with a ticket from a nearby interchange. The collector with the next highest number of UO5 transactions had twelve. Grievant also had twenty UO7 transactions during this time period. The collector with the next highest number of UO7 transactions had six. Thirty of the thirty-four collectors tracked did not have any UO7 occurrences during this period.

When a toll collector creates a UO6 transaction by pressing the regroup function of the computer system, a UO5 or UO7 will also occur. When a collector does not process a ticket, the axles "float" on the toll collector's monitor from transaction to transaction, until the collector clears the floating, unprocessed axles from her screen. When the collector removes the floating axles using the regroup function, either a code UO5 or UO7 is triggered. Grievant triggered a combined forty-one UO5 and UO7 transactions in the four-month period audited, only one less than her UO6 transactions. In comparing the number of UO6 transactions to the combined number of UO5 and UO7 occurrences, it suggests that Grievant had one accurate UO6 transaction and had the remaining forty-one incorrect.

Based upon Grievant's high number of UOs, the Commission conducted a more extensive audit of Grievant's UO6 transactions between August 1, 2004 and April 30, 2006. The Commission determined that Grievant had 361 UO6 transactions during that time period. No other collector at the Warrendale interchange had more than five UO6 transactions in that twenty month period. In one day, Grievant had three UO6 and three UO7 transactions.

The Commission further concluded that Grievant had manipulated its computer records by looking at the number of commercial tickets she processed from Butler Valley in which there was an extraordi-

narily large amount of time between entry and exit. The Commission records establish that the average travel time for the nine-mile trip between the Butler Valley and Warrendale interchanges is twelve minutes. There are no service plazas between the interchanges. Between January 1, 2006 and April 1, 2006, six hundred and thirty nine commercial vehicles entered at Butler Valley and exited through Warrendale. Of that number, the Commission records indicate forty-four with travel times of twenty-five minutes or longer. Grievant processed tickets for forty-one of those forty-four vehicles. The average time for Grievant's customers to travel nine miles was three hours and twelve minutes. Further, all forty-one vehicles with excessive travel times were processed with a ticket that was generated for a Class 1, two-axle vehicle at entry rather than the typical entry ticket for a commercial vehicle of Class 7, five-axles.

Additionally, the Commission conducted video surveillance of Grievant's work through its Digital Video Audio System (DVAS), which provides a visual record of traffic passing through the toll booths.[2] Using this system, on April 15, 2006, it was observed that Grievant did not insert a ticket from a class 1, 2 axle vehicle until

after several other vehicles were processed, during which time two additional axles remained on the computer screen until she used the REGROUP AXLE function to reconfigure two, two-axle vehicles into one, four-axle vehicle which was recorded as a UO5 transaction. Based on the information from the audit and the surveillance, the Commission determined that Grievant had intentionally falsified its records.

On May 15, 2006, the Commission held a pre-disciplinary meeting with Grievant and her Union representative. Grievant did not have an explanation for the high number of UOs she triggered. By letter dated May 23, 2006, the Commission informed Grievant that her employment was terminated effective May 15, 2006, for intentional falsification of official records or documents in violation of Article 25, Section 2.F. of the Collective Bargaining Agreement (CBA).[3]

A grievance was filed with the Commission on May 15, 2006. A Third Step hearing was held on June 14, 2006, at which the additional charge was raised of unauthorized alterations of computer data in violation of Article 225, Section 2.G of the CBA.[4] On July 3, 2006, the Commission's

2. The DVAS is a high speed camera which captures a continuous stream of digital images at one-second intervals. The DVAS is set up to link video images of vehicles with their corresponding toll transactions processed through the Commission's computers. The video images of the vehicles can be displayed on any Commission desktop computer simultaneously with the computer data for corresponding toll transactions.

3. Article 25, Section 1 and Section 2.F. of the CBA provide in pertinent part as follows:

Article 25—Discharge or Disciplinary Action
Section 1. No employee shall be suspended or discharged except for just cause. It is understood and agreed that any employee

who violates a Commission policy, rule or regulation or provision of this agreement shall receive a written warning for a first offense, a two (2) day suspension without pay for a second offense and shall be subject to discharge for a third offense.... A Union may appeal a discharge directly to the third step of the grievance procedure. Section 2. The following offenses shall constitute just cause for immediate discharge without adhering to the progressive disciplinary procedure described in Section 1 of this article.
\* \* \*

F. The intentional falsification of official records or documents.

4. The addition of this charge is not an issue in this appeal.

Third Step representative requested an extension of time in which to issue the Commission's Third Step response which had been due on June 24, 2006. By letter dated July 5, 2006, the Union representative denied such request. On July 11, 2006, the Commission issued its Third Step Response, denying the grievance and upholding the termination of Grievant.

On July 17, 2006, the Union, by letter, informed the Commission that it had violated the CBA due to its failure to give the Union a written response within ten working days of the Third Step hearing. The Union informed the Commission that it expected the Grievant to be reinstated, due to such untimeliness. On July 19, 2006, the Commission replied to the Union, informing it that the CBA does not provide for an automatic reinstatement of a grievant if the Commission's response is not rendered within ten working days of the hearing. On July 27, 2006, sixteen days after the due date of the Third Step Response, the Union requested grievance arbitration.

On April 3, 2007, a hearing was held before an Arbitrator. The question to be resolved was whether the Commission had just cause to terminate the Grievant. Testimony and evidence were presented and, thereafter, briefs were submitted. The Commission also argued that the Union's failure to timely appeal the Third Step Response rendered the grievance inarbitrable.

The Arbitrator ruled, regarding the procedural issue of the timeliness of the Third Step response, that the delay in the issuance of such response only entitles the Union to immediately appeal to arbitration and does not automatically result in a resolution in favor of Grievant. The Arbitrator determined that, with respect to the timing of the Union's appeal, the Commission had not raised the issue during the grievance procedure and therefore, it would not consider the issue at the hearing. The Arbitrator also found that Grievant's

extraordinary number of UO6 transactions over a 20–month period [361] considered in conjunction with the Grievant's high number of UO5 [21], UO6 [42] and UO7 [20] transactions during the four-month period provides evidence of [a] significant problem with Grievant's processing of toll fares.

However, unusual occurrences, in and of themselves, do not establish the existence of the misconduct contemplated by Article 25, Section 2. Indeed, the designations of UO5, UO6 and UO7 are a creation of the Commission, as a means of identifying the legitimate resolution of discrepancies that occasionally arise between the vehicle information on a toll ticket and the information electronically gathered in the vehicle's exit lane. Consequently, rather than the mere existence of such occurrences, the Commission was concerned by the high number of unusual occurrence transactions processed by the Grievant. As a result, it undertook surveillance of the Grievant performing her work duties. Surveillance videotape of the Grievant on April 15, 2006 revealed that she was not properly processing toll tickets. As a result, she created an unusual occurrence transaction in order to adjust for errors that occurred. When the surveillance evidence was considered in conjunction with the documentary evidence, there was certainly a sufficient basis for the Commission to conclude that the Grievant was failing to properly perform her work duties.

Thus, while the evidence amply demonstrates that the Grievant was not processing toll fares correctly, the charges against her are not limited to her work performance. Rather, she was charged

with the intentional falsification of records and documents and accused of the unauthorized alteration of computer systems. Both of these charges contain an element of intentional wrongdoing or willful misconduct, with intended malice rather than the mere failure to properly perform the duties of her job. Presumably, such malice would be for some personal gain, either financial or otherwise, for the Grievant or persons known to the Grievant.

Arbitrator's Award, July 20, 2007, at 9. The Arbitrator determined that the Commission did not sustain its burden of proving the charges for termination, sustained the grievance and ordered Grievant reinstated with full back pay and benefits. He further ordered that she undergo additional training as deemed necessary by the Commission. The Commission now petitions our Court for review of the Arbitrator's award.

The Commission contends that the Arbitrator's award was not rationally derived from the terms of the CBA, alleging that the Arbitrator added to the CBA's just cause provision a requirement of proof that the discharged employee's intentional falsification of official records was motivated by malice and personal or financial gain. The Commission further contends that under the terms of the CBA, the grievance is not arbitrable if the Union fails to comply with the contractual time limits for filing an appeal to arbitration. Grievant maintains that Commission's failure to issue a timely response warranted her reinstatement.

First, we will address the procedural issues raised by both parties regarding timeliness. Article 26 of the CBA provides in pertinent part as follows:

**ARTICLE 26—GRIEVANCE PROCEDURE**

SECTION 1. A grievance is a dispute concerning the interpretation, application or alleged violation of a specific term or provision of this agreement. Any grievance arising between the Commission and the Union or an employee represented by the Union shall be settled in the following manner:

\* \* \*

B. At all steps of the grievance procedure, an employee shall have the right to the advice, consent and representation of a Steward on his/her behalf. A Steward may, upon obtaining written permission from the employee, act on the employee's behalf without the employee being present at any step of the grievance procedure.

\* \* \*

**THIRD STEP: COMMISSIONERS OR THEIR DESIGNEE**

If the Union is not satisfied with the disposition of the grievance at Step 2, it may submit a written appeal to the Commissioners or their designee within ten (10) work days after receiving a decision at the second step. The Commissioners or their designee, within ten (10) working days following the hearing, shall give the employee and Union a written decision. If the Union does not proceed with the grievance to the fourth step within the time limit prescribed in the following subsection and no extension of time is mutually agreed upon, the grievance shall be considered to be satisfactorily resolved.

**FOURTH STEP: ARBITRATION**

If the grievance is not satisfactorily resolved at Step 3, the Union may appeal to arbitration within ten (10) work days after the decision at Step 3 is rendered.

\* \* \*

C. The time limits set forth in the grievance procedure shall, unless ex-

tended by mutual written agreement of the Commission and the Union, be binding and any grievance not timely presented, or timely processed thereafter, shall not be considered a grievance under this agreement and shall not be arbitrable. Any of the above time frames can be extended by mutual agreement of the parties.

■ The Arbitrator determined that the Commission's Third Step response was untimely. The Arbitrator reviewed Article 26 of the CBA and determined that the CBA set forth what would happen if the Union failed to timely proceed to the next step. He further determined that Article 26 does not set forth what would happen if the Commission was untimely in making its decision. The Arbitrator found that pursuant to Article 26, Fourth Step, Section C of the CBA, the grievance would not be arbitrable due to the untimely decision. However,

> inarbitrability does not equate to a resolution of the grievance in the Union's favor. Rather, the normal result from a finding of inarbitrability is that a grievance is precluded from consideration at the arbitration stage of the proceedings. In this matter, if this rationale were carried to its logical conclusion, it would result in the preclusion of the Union's protest to the Grievant's discharge. Such a result would clearly be illogical and contrary to the intended purpose of the grievance procedure.... The appropriate remedy for the Commission's failure to issue a timely Step 3 Response is to permit the Union to proceed to the next step of the grievance without having to wait for the Commission's response. This remedy permits the Union

to proceed with the grievance without undue delay caused by the Commission's actions. In this matter, the Union chose to wait for the Step 3 response before appealing to arbitration. As such, the Union did not sustain any harm and the grievance is properly considered at arbitration.

Arbitrator's Award, at 7–8. After review of the language governing procedure in the CBA, we agree with the Arbitrator that the Commission's failure to timely file the Third Step response resulted in the Union's remedy being only to unilaterally proceed to arbitration without further waiting for the Commission's response and did not result in the grievance being automatically resolved in favor of Grievant.

The Commission contends that the Union was untimely in appealing the grievance to arbitration. The Commission brought this issue up for the first time at the arbitration hearing. The Arbitrator chose not to consider this issue because the Commission did not raise it when it had ample opportunity to do so between the July 27, 2006 filing of the appeal for arbitration and the April 3, 2007 arbitration hearing date.

■ Parties before an arbitrator can request that the case be dismissed prior to the actual hearing date. Our Supreme Court stated in *School District of the City of Duquesne v. Duquesne Education Association*, 475 Pa. 279, 285, 380 A.2d 353, 356 (1977), that "the final determination of the procedural issue is to be left to the arbitrator.[5]" We will not, therefore, interfere with the determination of this procedural issue by the arbitrator.

5. In *School District of the City of Duquesne,* the arbitrator addressed the untimely filing of the grievance by the grievant, ultimately determining to hear the case. Our court reversed the arbitration award and the Supreme Court reversed our court's decision, determining that timeliness was a procedural issue to be decided by the arbitrator.

Next, we will address the Commission's contention that the Arbitrator's award was not rationally derived from the CBA. The CBA provides that the intentional falsification of official records or documents or the unauthorized alterations of computer records constitutes just cause for immediate discharge. Article 25, Sections 2.F. and 2.G of the CBA. The Arbitrator found that the Commission proved "failure to properly perform the duties of her job," but did not show that Grievant's "errors were intentionally committed." Arbitrator's Award, at 9. The Arbitrator interpreted the CBA stating that "because the evidence did not establish that Grievant acted as charged, her discharge was without just cause...." Arbitrator's Award, at 10.

█ The Commission contends that the Arbitrator's award is not rationally derived from the CBA. Our standard of review is the "essence test," a standard calling for great deference to the arbitrator's interpretation of the CBA. The "essence test" is comprised of a two-prong analysis. "First, it must be determined whether the issue submitted to arbitration, as properly defined, is encompassed within the terms of the collective bargaining agreement ... [and] [s]econd, the arbitrator's award must be rationally derived from the collective bargaining agreement." *Allegheny County Airport Authority v. Construction General Laborers and Material Handlers Union, 1058*, 874 A.2d 1250, 1254 (Pa.Cmwlth.2005), citing, *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405 (1999).[6]

The Commission alleges that the Arbitrator's award is not rationally derived from the CBA. The Commission contends that once the Arbitrator determined that Grievant had knowingly falsified the Commission's official records on its computers that the Arbitrator stepped beyond the bounds of the CBA in finding that such alteration was not "intentional" due to the fact that the Commission did not prove "intended malice" or "some personal gain, either financial or otherwise" on the part of Grievant.

The Arbitrator's award provides in pertinent part as follows:

> Although the evidence fully established that the Grievant was not performing her job duties correctly, the record does not indicate that her errors were intentionally committed. Significantly, with the full panoply of investigative resources available to it, the Commission could point to no evidence of the Grievant having achieved gain, either personal or financial, by failing to properly process toll fares. There is also no indication of any such gain to persons known to the Grievant. Furthermore, there does not appear to be any established financial harm to the Commission by the Grievant's actions. Rather, it appears that the sole effect of the Grievant's failure to properly process tolls is that some motorists paid an excessive toll, while other motorists paid an insufficient toll.... The record as a whole simply does not establish the elements of intentional wrongdoing or malice on the part of the Grievant even though her actions understandably give rise to suspicions about her motive. Based on the record, a picture is painted only of demonstrated incompetence, not demonstrated gain. Therefore, the charges of intentional falsification of records and unauthorized alteration of computer sys-

---

6. The parties agree that the issue submitted to arbitration is encompassed within the terms of the CBA. Thus, we need not address that issue.

tems have not been proven and cannot stand.

Because the evidence did not establish that the Grievant acted as charged, her discharge was without just cause, in violation of the Agreement. Nevertheless, it is abundantly apparent that the Grievant was not adequately performing her job duties, as tolls were not being properly processed. While other Toll Collectors at the Warrendale Interchange appear to be processing tolls with minimal irregularities, the Grievant has demonstrated gross deficiencies in her job performance. . . .

Arbitrator's Award, at 9–10.

■ The Arbitrator noted that while the evidence amply demonstrated the incompetence of Grievant in processing tolls correctly, the charges against her were not limited to her work performance but also encompassed the element of intent as a prerequisite for a just cause discharge. Thus, while the Commission proved that Grievant made many errors on her job, it failed to prove that they were intentional falsifications. Although this Court might disagree with the Arbitrator's interpretation of the facts, it is not within our scope of review to make an inference of intent from the nature and extraordinary repetition of errors by Grievant. The Court should not become embroiled in the merits of the arbitration. *Cheyney University.*

■ The Arbitrator found that the Commission failed to prove that Grievant acted intentionally and set forth examples of acts from which such intent could be inferred, such as, financial gain, personal gain, financial harm to the Commission, benefit to others, ulterior motives, etc. We do not agree with the Commission, which argues that the Arbitrator added a non-bargained requirement onto its burden by the use of such examples. The CBA requires not only falsification, but

"intentional" falsification on the part of the employee in order to prove "just cause" for immediate discharge without adhering to the progressive disciplinary procedure for discharge. Article 5, Section 2.F. of the CBA. As the Arbitrator did not find an intentional act, it is clear that the Arbitrator's award was rationally derived from the CBA. The Arbitrator's conclusion that there was no just cause for terminating Grievant was, therefore, drawn from the essence of the CBA.

The Commission further argues that the Arbitrator's award interferes with the Commission's "ability to ensure proper operation of its organization" and impairs the Commission's ability to perform its essential function, its "core functions." Subsequent to the Arbitrator's award, our Supreme Court issued a decision in *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA,* 595 Pa. 648, 939 A.2d 855 (2007), addressing the judicial review of arbitration awards. In *Westmoreland,* our Supreme Court decided in pertinent part as follows:

[W]e reject the core functions exception to the essence test and supplant it with the public policy exception to the essence test.

More specifically, we hold that upon appropriate challenge by a party, a court should not enforce a grievance arbitration award that contravenes public policy. Such public policy, however, must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. *Eastern Associated Coal [Corp. v. United Mine Workers of America, District 17,* 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000)]; *cf. [City of Philadelphia] Officer (sic) of Housing and*

*Community Development [v. American Federation of State County and Municipal Employees, Local Union No.1971,* 583 Pa. 121, 876 A.2d 375 (2005)].* *Westmoreland,* 595 Pa. at 665–66, 939 A.2d at 865–866. Thus, the Supreme Court rejected and overruled the previously permitted 'core functions' exception to the essence test and supplanted it with a 'public policy' exception. *Westmoreland.*

Prior to arguments before our court, the Commission was granted permission to submit a supplemental brief addressing *Westmoreland* and the public policy exception. The Commission argued in its brief that the Arbitrator's award, nevertheless, comes within the sole exception to the essence test because the award violates public policy in that it compromises the integrity of the Commission's toll-collection system.

■ A reviewing court is not permitted to review the merits of the arbitration, "but rather, must only determine if the award is indisputably and genuinely without foundation in or fails to logically flow from the collective bargaining agreement." *Westmoreland,* 595 Pa. at 667, 939 A.2d at 866. Our review in addressing the public policy exception to the essence test is to determine whether the Arbitrator's award violated a public policy of the Commonwealth of Pennsylvania, not whether the misconduct giving rise to the award violated a policy or work rules of the Commission. There is no public policy that mandates the discharge of all employees who are alleged to have committed acts of misconduct. *See AFSME v. State of Illinois, Dept. of Mental Health,* 124 Ill.2d 246, 124 Ill.Dec. 553, 529 N.E.2d 534 (1988) (no public policy mandating the discharge of all employees found guilty of mistreatment of a service recipient when an arbitrator expressly finds that the grievants were exemplary employees, when punishment was imposed and where no nexus exists between the infraction and the patient's death).

■ Since the Commission asserts the public policy exception, it has the burden to establish that the Arbitrator's award comes within that sole exception to the essence test. *Westmoreland.* The Commission asserts violations of the work rules and the CBA, both of which are an important part of the operation and management of the Turnpike. To come within the exception, however, the Commission must establish that a public policy of the Commonwealth has been violated that is well defined, dominant and ascertained by reference to the laws and legal precedents, as opposed to being ascertained from general considerations of supposed public interests, that supports reversing the Arbitrator's award. *Id.* No such public policy of the Commonwealth of Pennsylvania has been identified by the Commission, however.

■ The Arbitrator determined that the Commission failed to prove that the Grievant acted as charged. The Arbitrator determined that the Grievant's conduct did not amount to "just cause" for dismissal. The parties received the benefit of their bargain, as the Arbitrator was asked to interpret the "just cause" provision and did so consistent with the CBA. It is the Arbitrator's role to interpret the terms of the CBA. *Office of the Attorney General v. Council 13, American Federation of State, County & Municipal Employees, AFL–CIO,* 577 Pa. 257, 844 A.2d 1217 (2004). The Arbitrator's award was rationally derived from the CBA and did not violate public policy.

Accordingly, we must affirm the award of the Arbitrator.

President Judge LEADBETTER dissents.

## *O R D E R*

AND NOW, this 23rd day of April, 2008 the award of arbitrator Edward J. O'Connell in the above-captioned matter is affirmed.